**John D. SARVISS, individually and on behalf of all others similarly situated, Plaintiff,**

v.

**GENERAL DYNAMICS INFORMATION TECHNOLOGY, INC., Defendant.**

**Case No. CV 08–01484 DDP (CWx).**

United States District Court, C.D. California.

July 14, 2009.

Abigail Ameri Treanor, D. Alan Harris, Matthew E. Kavanaugh, Harris and Ruble, Los Angeles, CA, for Plaintiff.

Benjamin Juhyeok Kim, Framroze M. Virjee, Michael W. Garrison, Jr., O'Melveny & Myers LLP, Los Angeles, CA, for Defendant.

**ORDER GRANTING IN PART AND DENYING IN PART MOTION FOR SUMMARY JUDGMENT, DENYING MOTION FOR CERTIFICATION OF COLLECTIVE ACTION, AND DENYING MOTION FOR CLASS CERTIFICATION**

[Defendant's Motion for Summary Judgment filed on April 6, 2009; Plaintiff's Motions filed March 27, 2009]

DEAN D. PREGERSON, District Judge.

This matter comes before the Court on three motions filed by the parties. Plaintiff John D. Sarviss ("Sarviss" or "Plaintiff"), who brings this wage and hour case as a purported class action and collective action, has filed a Motion for Certification of a Collective Action as to his Fair Labor Standards Act ("FLSA") claims and a Motion for Class Certification of his California state wage and hour claims. In addition to opposing Plaintiff's certification motions, Defendant General Dynamics Information Technology ("GDIT" or "Defendant") moves for summary judgment on Plaintiff's claims. After reviewing the materials submitted by the parties, hearing oral argument, and considering the issues raised in both, the Court grants in part and denies in part Defendant's Motion and denies Plaintiff's Motions for the reasons stated below.

## I. BACKGROUND

Plaintiff filed this action in California state court on January 28, 2008 against his former employer, GDIT. GDIT provides information technology solutions and services to military, government, and commercial customers within the United States and around the world, including, as relevant to Sarviss, in connection with some of the United States' defense and homeland security projects. Def.'s State-

ment of Uncontroverted Facts and Conclusions of Law, ¶ 1; Pl.'s Statement of Genuine Issues in Opp'n to Def. Statement, ¶ 1. Defendant removed the action to this Court on March 3, 2008.

### A. Plaintiff John Sarviss and His Employment with GDIT [1]

In late April or early May 2007, Plaintiff John Sarviss saw and responded to a GDIT job posting on the internet for "qualified AH–1F and UH–1H/Bell 412 helicopter pilots to support [GDIT's] aviation requirements in [P]akistan." DSUF ¶ 2 (quoting Garrison Decl., Ex. A at 170); PSGI ¶ 2. AH–1F and UH–1H/Bell 412 are models of helicopters used for military and defense purposes. Id. The job posting required candidates to "be recognized as an Army Master Aviator and be qualified as either an SIP or IP with in-depth experience using NVGs." [2] Id. at ¶ 4 (quoting Garrison Decl., Ex. A at 170). An "Army Master Aviator" must have 2,000 flight hours. Id. at ¶ 5. The terms "SIP" and "IP" are acronyms for Standardized Instructor Pilot and Instructor Pilot, respectively. Id. at ¶ 6. In addition to being a pilot instructor, an SIP typically ensures that flight standards are consistent for all of the IPs. Id.

Plaintiff John Sarviss is a California resident and a former United States Army helicopter pilot. Compl. ¶ 1; Garrison Decl., Ex. A at 169. Sarviss had approximately eight times the flight hours required to be considered an Army Master Aviator, and his background and training included coursework to become an SIP and

training and experience working with NVGs. DSUF ¶ 7; PSGI ¶ 7. Sarviss had flown helicopters, including AH–1F and UH–1H/Bell412 helicopters, for more than 16,000 hours and had approximately 4,700 hours flying at night and 260 hours of flying with NVGs. Id. at ¶ 8.

On or about May 14, 2007, GDIT hired Sarviss to work with the team of NVG helicopter pilot trainers in Pakistan. Id. at ¶ 9. Plaintiff's job title was "Operations Analyst V," a salaried position classified as exempt from overtime by GDIT, and he held no other positions with GDIT. DSUF ¶ 11.[3] On the basis of the mission summary, Sarviss understood that his job would be "training Pakistani helicopter pilots in night vision goggle combat tactics in support of the global war on terror." Garrison Decl., Ex. A (Sarviss Deposition) at 30:8–12.

GDIT's contract with the U.S. Government required Sarviss to complete his training before deploying to Pakistan. DSUF ¶ 14; PSGI ¶ 14. Immediately after being hired, from May 14 to May 18, 2007, Sarviss attended the U.S. Army Security Assistance Team Training Orientation Course at Fort Bragg, North Carolina. Id. at ¶ 13. These training sessions, which included other trainees deploying to countries all over the world, addressed topics related to Sarviss's mission, including an orientation about Pakistan, counter-surveillance, counter-terrorism procedures, weapons training, and hostage survival. Id. at ¶ 15. The training courses at Fort Bragg lasted one

---

1. Except where noted, the Court draws these facts from the parties' statements of uncontroverted and disputed facts. For ease of reference, the Court uses the following abbreviations: for Defendant's Statement of Uncontroverted Facts and Conclusions of Law, "DSUF"; for Plaintiff's Statement of Genuine Issues, "PSGI"; and for Defendant's Reply Statement, "DSUFR."

2. "NVG" stands for Night Vision Goggles.

3. Plaintiff's objections to DSUF ¶ 11 do not go to these facts. It is undisputed that Plaintiff's job *title* was Operations Analyst V. Garrison Decl., Ex. A at 91.

work week for eight hours each day. Garrison Decl., Ex. A at 50:18–22. Sarviss claims that he spent an additional 20 hours that week engaging in tasks to prepare for his deployment, including obtaining equipment at Pope Air Force Base, filling out additional paperwork, receiving the necessary vaccinations, and obtaining his passport, visa, and contractor access card. DSUF ¶ 18; PSGI ¶ 18. Shortly after completing the training at Fort Bragg, Sarviss attended a five-day flight safety course in the Dallas/Forth Worth, Texas area. Id. at ¶ 19. The course was provided by a third party and served as a refresher training for flying the Bell 412 helicopter in which Sarviss would be training members of the Pakistani Air Force. Id. at ¶ 20. While at that training, Sarviss attended the course from 8:00 a.m. to 5:00 p.m. each day and was provided two 15–minute rest breaks and a 30–minute lunch break. Garrison Decl., Ex. A at 61:8–62:2. At night, Plaintiff attended flight simulation exercises for another 1.5–2.5 hours. DSUF ¶ 22; PSGI ¶ 22.

After completing the training course in Texas, Sarviss returned to his home in California to await deployment to Pakistan. Id. at ¶ 23. He waited there for approximately two weeks, during which time he was not asked to work more than 8 hours per day or 40 hours per week and during which time he was not denied any meal or rest periods. Id. at ¶¶ 23, 25, 26. While awaiting deployment in California, Plaintiff received his base salary. DSUF ¶ 12; PSGI ¶ 12. During that time, Sarviss spent time preparing for his deployment and purchased supplies; the parties dispute whether these activities were at Sarviss's "own initiative." Id. at ¶¶ 12, 24.

During the first week of June 2007, Sarviss deployed to Pakistan, where he remained for around 90 days. Garrison

Decl., Ex. A at 88:15–89:1. Sarviss described his "primary job" while in Pakistan as "keep[ing] myself and my co-pilot alive because of their lack of knowledge on how to operate an aircraft at night." Garrison Decl., Ex. A at 92:6–8. The parties dispute the amount of "teaching" or "training" Sarviss actually did while in Pakistan. DSUF ¶ 29; PSGI ¶ 29. GDIT employee John Landis taught classes on the ground. At the very least, however, Sarviss admits that he "was the first person to come [to Pakistan] and within one week of being [there] was actually training students and had met Lieutenant Colonel Shahid's approval." Garrison Reply Decl., Ex. A (Sarviss Depo.) at 51:6–10; see Garrison Decl., Ex. A (Sarviss Depo.) at 121:1–10; id. at 128; see also DSUFR at 29–31. During a training flight, Sarviss typically would put NVGs on the trainee and give him the controls to the helicopter. Sarviss constantly monitored the helicopter's instruments, and took the controls away from the pilot if necessary. Sarviss also checked to ensure that the pilot trainee was interpreting the terrain correctly through the NVG. DSUF ¶ 31; PSGI ¶ 31. While in Pakistan, Sarviss instituted a rule with the trainees that a pilot should return the helicopter with 700 pounds of fuel remaining. Garrison Decl., Ex. A at 149:21–150:7. Sarviss was required to rely upon his thirty-plus years of military and civilian experience and training while flying with Pakistani trainees. DSUF ¶ 36. Sarviss also prepared instrument approaches for "divert" fields; located a survival escape and evasion area, and created and put into place a plan; and conducted approximately 10 "captain check rides," during which he would evaluate and certify a trainee as an aircraft commander. DSUF ¶ 33.[4] Sarviss claims the Pakistani Air Force made him the SIP for the entire

4. Plaintiff's relevancy objection is overruled.

squadron, but the parties dispute whether this was within the scope of his GDIT assignment. DSUF ¶ 34; PSGI ¶ 34.

While in Pakistan, Sarviss frequently worked in excess of 8 hours per day and 40 hours per week. In some weeks, he worked in excess of 70 or 80 hours per week. DSUFR at 59–60.

On July 17, 2007, Sarviss tendered his resignation to GDIT. DSUF ¶ 37; PSGI ¶ 37. In that letter, Sarviss stated that he "still ha[d] not been reimbursed for expenses incurred on your behalf over 60 days ago for several thousand dollars." DSUFR at 67. On or about August 7, 2007, Sarviss submitted an amended resignation letter seeking to move his last day of employment to September 4, 2007. DSUF ¶ 37; PSGI ¶ 37.

During his employment with GDIT, GDIT paid Sarviss an annual salary of $83,200.00, paid biweekly at $3,200.00 per pay period. *Id.* at ¶ 39. GDIT paid Sarviss his base salary while he attended training in North Carolina and Texas and also while he was at home in California waiting to deploy to Pakistan. *Id.* While working in Pakistan, in addition to his base salary, GDIT paid Sarviss an additional 25% of his base salary for "Danger Pay," an additional 20% "Hardship Differential," and a full $30,000 contractual "completion" bonus. *Id.* at ¶¶ 40–41. Plaintiff's actual pay can be summarized as follows: (1) $6,400 for the first four weeks; (2) $27,840.00 for the 12 weeks in Pakistan; and (3) a $30,000.00 completion bonus. Thompkins Decl. ¶ 11.

The GDIT "International Assignment Provisions for John D. Sarviss" stated, under "Scheduled Hours," that the assignment was "based on 40 hours per week." Thompkins Decl., Ex. A at 9.[5] It is undis- puted that Sarviss was not compensated for overtime he worked or for missed meal and rest periods. DSUFR at 60.

### B. The Complaint

Plaintiff's Complaint seeks to bring eight causes of action against GDIT.[6] The Complaint alleges one cause of action pursuant to the federal Fair Labor Standards Act ("FLSA"), six causes of action pursuant to the California Labor Code ("Labor Code"), and one cause of action pursuant to California's unfair competition law, California Business and Professions Code § 17200 ("UCL").

In his FLSA claim, Plaintiff alleges that Defendant mis-classified Plaintiff as an exempt employee and failed to pay him overtime in violation of 29 U.S.C. § 207(a). Compl. ¶¶ 54–59.

Plaintiff brings six claims under the California Labor Code. His First Claim for Relief alleges that GDIT improperly classified Plaintiff as "exempt" and, as a result, failed to pay overtime in violation of California Labor Code §§ 218 & 1194(a) and Industrial Welfare Commission ("IWC") Wage Order No. 4. Compl. ¶¶ 35–49. The Second Claim for Relief alleges that GDIT violated California Labor Code § 226 and IWC Wage Order No. 4 in failing to provide itemized wage statements showing total hours worked, the applicable hourly rates, and the legal name and address of the employer. Compl. ¶¶ 50–53. The Fourth and Fifth Claims for Relief allege that GDIT failed to provide Plaintiff with adequate meal periods and rest periods in violation of California Labor Code § 226.7 and IWC Wage Order No. 4. Compl. ¶¶ 60–67. Plaintiff's Sixth Claim for Relief alleges that GDIT failed to pay wages

---

5. The Court notes that there are no breach of contract allegations in the Complaint.

6. The Complaint is attached as Exhibit A to Defendant's Notice of Removal. *See* Doc. No. 1 at 0011 (March 3, 2008).

earned and unpaid promptly upon termination or resignation in violation of Labor Code §§ 201–202 and seeks continuing wages pursuant to section 203. Compl. ¶¶ 68–71. The Seventh Claim for Relief alleges that GDIT failed to reimburse Plaintiff for his expenditures in violation of California Labor Code § 2802. Compl. ¶¶ 72–75.

Finally, the Eighth Claim for Relief alleges that GDIT's acts "constitute a continuing and ongoing unlawful activity prohibited by section 17200 *et seq.* of the California Business and Professions Code." Compl. ¶ 76; *see id.* at 77–90.

### C. Class and Collective Action Facts and Allegations

Plaintiff seeks to bring this action as a representative action on behalf of himself and others similarly situated. With respect to the California claims, Sarviss originally sought to bring his claims "on behalf of all residents of the State of California who, at any time during the four years preceding the filing of the Complaint through the filing of a motion for class certification, received a pay stub or wage statement from the Defendant or its predecessor in interest, Anteon International Corporation." Compl. ¶¶ 5, 21. With respect to the FLSA claim, Sarviss originally sought to bring the action as an opt-in collective action pursuant to 29 U.S.C. § 216(b) "on behalf of all persons who, at any time during the three years preceding the filing of this Complaint, were or have been employed as persons governed by Industrial Welfare Commission Wage Order No. 4–2001 regulating wages, hours and working conditions in the technical, clerical, mechanical and similar occupations by GDIT and who did not receive or have not received overtime compensation as required by federal law." Compl. ¶¶ 5, 31. As discussed below, Sarviss narrowed his certification requests in his Replies to GDIT's Oppositions to both certification motions.

## II. MOTION FOR SUMMARY JUDGMENT

First, the Court addresses GDIT's Motion for Summary Judgment.[7] GDIT moves for summary judgment as to the entirety of Plaintiff's Complaint, or, in the alternative, for partial summary judgment. GDIT argues that summary judgment must be entered in its favor as to the FLSA claims both because the FLSA does not apply and because Plaintiff was exempt from its requirements. GDIT also argues that summary judgment must be entered in its favor as to the California claims both because California wage and hour law does not apply and because Plaintiff was administratively exempt.

### A. Legal Standard

Summary judgment is appropriate where "the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is

---

7. A district court has discretion to rule on a motion for summary judgment before it decides certification issues, "[u]nder the proper circumstances." *Wright v. Schock,* 742 F.2d 541, 543–44 (9th Cir.1984). Proper circumstances will exist when the court determines that "resolution of a motion for summary judgment seems likely to protect both the parties and the court from needless and costly further litigation." *Id.* at 544. Proper circumstances will not exist, however, where the Court considers a "transitory claim that cries out for a ruling on certification as rapidly as possible." *Wade v. Kirkland,* 118 F.3d 667, 670 (9th Cir.1997). Although Plaintiff has cited authority to the effect that a certification order should not address the merits of a claim, Plaintiff has not suggested that it is inappropriate for the Court to address the summary judgment motion before certification. For the sake of judicial economy, then, it makes sense to do so here.

entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). All reasonable inferences from the evidence must be drawn in favor of the nonmoving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). A genuine issue exists if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party"; and material facts are those "that might affect the outcome of the suit under the governing law." *Anderson*, 477 U.S. at 248, 106 S.Ct. 2505. A party opposing summary judgment must come forward with specific facts, supported by admissible evidence, showing a genuine issue for trial. Fed. R.Civ.P. 56(e); *Brinson v. Linda Rose Joint Venture*, 53 F.3d 1044, 1049 (9th Cir.1995).

Summary judgment is warranted if a party "fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). No genuine issue of fact exists "[w]here the record taken as a whole could not lead a rational trier of fact to find for the non-moving party." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986).

Plaintiff appears to agree that there are no genuine issues of material fact underlying Defendant's legal arguments as to whether the FLSA and/or California wage and hour law applies. Plaintiff does argue, however, that there are genuine issues of material fact as to whether Plaintiff is exempt under either the FLSA or California wage and hour law.

**B. Discussion**

1. *Plaintiff's FLSA Claims*

First, Defendant moves for summary judgment on Plaintiff's FLSA claims.

The parties agree that the FLSA does not apply to Plaintiff's service in Pakistan, which comprises the majority of his employment with GDIT. *See* 29 U.S.C. § 213(f) ("The provisions of sections 206, 207, 211, and 212 of this title shall not apply with respect to any employee whose services during the workweek are performed in a workplace within a foreign country[.]"). The FLSA therefore indisputably does not provide a basis for overtime pay while Sarviss was in Pakistan. Accordingly, the only question is whether Plaintiff can succeed on his FLSA claims for the time he spent in training in North Carolina and Texas. Defendant argues that summary judgment should be granted in its favor for two independent reasons: (1) Plaintiff falls under the FLSA's "highly paid employee" exemption and (2) Plaintiff falls under the FLSA's administrative exemption. An employer has the burden of proof to establish the applicability of an exemption under the FLSA. *Corning Glass Works v. Brennan*, 417 U.S. 188, 196–97, 94 S.Ct. 2223, 41 L.Ed.2d 1 (1974). Accordingly, to succeed on summary judgment here, GDIT must establish the absence of a genuine issue of material fact as to each element of the relevant exemption. Additionally, GDIT must satisfy this burden against the legal backdrop that "[w]hether employees are exempt from the requirements of the FLSA is primarily a question of fact." *Nigg v. U.S. Postal Serv.*, 555 F.3d 781, 788 (9th Cir.2009) (internal quotation marks and brackets omitted).

a. *The "Highly Paid Employee" Exemption*

First, GDIT argues that Sarviss falls under the "highly paid employee" exemption from the FLSA. Because "[a] high level of compensation is a strong indicator of an employee's exempt status," under the FLSA high compensation "eliminat[es]

the need for a detailed analysis of the employee's job duties." 29 C.F.R. § 541.601(c). To fall within this exemption (the requirements of which the parties do not dispute), an employee must (1) have a "total annual compensation of at least 100,-000," *id.* § 541.601(a); (2) "customarily and regularly perform[ ] any one or more of the exempt duties or responsibilities of an executive, administrative, or professional employee," *id.;* and (3) have included in his primary duty "perform[ing] office or non-manual work," *id.* § 541.601(d). The parties also do not appear to dispute that, although the FLSA does not apply to Plaintiff's service while he was in Pakistan, the applicability of an exemption turns on the duties of the entire job. In sum, the parties do not dispute the FLSA law so much as the extent to which the facts implicate it.[8]

### i. Total Annual Compensation of At Least $100,000

To qualify for the exemption, an employee must make at least $100,000 in total annual compensation. "Total annual compensation" may include "commissions, non-discretionary bonuses and other nondiscretionary compensation earned during a 52–week period," but does not include board, lodging, payments for medical insurance and life insurance, contributions to retirement plans, or the cost of other fringe benefits. 29 C.F.R. § 541.601(b)(1). For an employee who does not work a full year for the employer, the employee may qualify for the exemption if the employee "receives a pro rata portion" of $100,000 "based upon the number of weeks that employee will be or has been employed." 29 C.F.R. § 541.601(b)(3). Additionally, an employee must receive "at least $455 per week paid on a salary or fee basis." *Id.* § 541.601(b).

GDIT has met its burden to show that Sarviss qualifies for this first element of the exemption using the pro rata approach, and Sarviss has not shown that there are genuine issues of material fact as to that prong. Even excluding the $30,000 completion bonus, Sarviss's average weekly salary would have led to an annual compensation of $111,280.00. *See* Thompkins Decl. ¶ 11; Def.'s Mem. at 10–11 & n. 6; *see* 29 C.F.R. § 541.601(b)(3). In each week, his salary exceeded $455.00. Although Sarviss asserts in a footnote that none of his salary was guaranteed, *see* Pl.'s Opp'n at 8 n. 6, he does not explain (through legal authority or otherwise) why the pay he actually received and that formed the basis of GDIT's calculation was in any way "discretionary." Accordingly, the Court finds that there is no genuine issue of material fact as to this element.

### ii. Customary and Regular Performance of One or More Exempt Duties

The second prong of the exemption requires an employee to "customarily and regularly perform[ ] any one or more of the exempt duties of an executive, administrative, or professional employee." 29 C.F.R. § 541.601(b). The performance of an exempt duty will be considered customary and regular where it occurs on a basis that is "greater than occasional but which, of course, may be less than constant. Tasks or work performed 'customarily and regularly' includes work normally and recurrently performed every workweek," as opposed to "isolated or one-time tasks." 29 C.F.R. § 541.701. Here, GDIT asserts that Sarviss qualifies under this prong with respect to the duties of either an administrative or a professional employee.

---

**8.** Plaintiff argues that GDIT conflates various prongs of these tests. The Court disagrees with that characterization of Defendant's argument. Rather, Defendant argues that the same facts satisfy different prongs of the relevant exemptions.

### (A) Administrative

An employee will fall under the administrative exemption if the employee is one whose primary duty "is the performance of office or non-manual work directly related to the management or general business operations of the employer or the employer's customers" and "includes the exercise of discretion and independent judgment with respect to matters of significance." 29 C.F.R. § 541.200(a)(2)-(3). For the purposes of the highly compensated employee exemption, the Court need only be satisfied that one of these prongs is met, and the Court need not engage in a detailed analysis of the other prong. *See Amendola v. Bristol–Myers Squibb Co.,* 558 F.Supp.2d 459, 476–77, 478 (S.D.N.Y. 2008).

An employee meets the first requirement—the performance of "office or non-manual work directly related to the management or general business operations of the employer or the employer's customers"—where the employee "perform[s] work directly related to assisting with the running or servicing of the business, as distinguished, for example, from working on a manufacturing production line or selling a product in a retail or service establishment." 29 C.F.R. § 541.201(a). Employees "acting as advisers or consultants to their employer's clients or customers" may satisfy this first prong. *Id.* § 541.201(c). The specific examples used by the regulation are those of business consultants.

An employee meets the second requirement when he exercises "discretion and independent judgment with respect to matters of significance." The Department of Labor's regulations define the exercise of discretion and independent judgment in part as follows:

In general, the exercise of discretion and independent judgment involves the comparison and the evaluation of possible courses of conduct, and acting or making a decision after the various possibilities have been considered. The term "matters of significance" refers to the level of importance or consequence of the work performed. [¶] The phrase "discretion and independent judgment" must be applied in the light of all the facts involved in the particular employment situation in which the question arises. Factors to consider when determining whether an employee exercises discretion and independent judgment with respect to matters of significance include, but are not limited to: whether the employee has authority to formulate, affect, interpret, or implement management policies or operating practices; whether the employee carries out major assignments in conducting the operations of the business; whether the employee performs work that affects business operations to a substantial degree, even if the employee's assignments are related to operation of a particular segment of the business; whether the employee has authority to commit the employer in matters that have significant financial impact; whether the employee has authority to waive or deviate from established policies and procedures without prior approval; whether the employee has authority to negotiate and bind the company on significant matters; whether the employee provides consultation or expert advice to management; whether the employee is involved in planning long- or short-term business objectives; whether the employee investigates and resolves matters of significance on behalf of management; and whether the employee represents the company in handling complaints, arbitrating disputes or resolving grievances. [¶] [Additionally, t]he exercise of discretion and independent judgment implies that the employee has authority to make

an independent choice, free from immediate direction or supervision.

29 C.F.R. § 541.202(a)-(c).

GDIT argues that Sarviss satisfied both of these prongs because the nature of job required "customarily and regularly" training Pakistani pilots. With respect to the non-manual labor prong, GDIT argues that Sarviss "act[ed] as an adviser to train Pakistani Air Force pilots in night flight operations." *See* Def.'s Mem. at 14. Although the Court recognizes that employees who act as advisers or consultants for customers may satisfy the non-manual labor prong, the Court is not convinced that the nature of Plaintiff's job places him into such a category. As far as the Court can tell, the examples in the regulations do not specifically list training. With respect to consulting performed for the Pakistani commander, it appears that there is a genuine issue of material fact as to whether this occurred during the course of Plaintiff's employment. *See* Sarviss Decl., Ex. 1 at 165–66.

Additionally, GDIT argues that Sarviss "customarily and regularly" engaged in the exercise of discretion and independent judgment with respect to matters of significance in training the pilots. GDIT supports its arguments with various portions of Sarviss's deposition testimony that indicate, for example: (1) that he worked with different students of different skill levels each night, Garrison Decl., Ex. A at 120–21; (2) that he was "constantly monitoring the instruments, taking the controls away from them[,] ... making sure that they are seeing what I'm seeing, that they are interpreting the terrain correctly," *id.* at 155; (3) that he instituted a rule requiring the return of a helicopter with 700 pounds of fuel, *id.* at 149–50; (4) that he did "captain check rides" to evaluate and certify a trainee, *id.* at 147–48; and (5) that he could not rely on Landis to deal with issues of inadequate Pakistani skill level, *id.* at 129–30. In a declaration in support of his Opposition to this motion, Sarviss disputes whether he actually did any training in how to fly helicopters because the pilots were already experienced and the real "training" consisted of reading materials and on-the-ground instruction, and suggests that he was merely a co-pilot or crew member. Sarviss Decl. ¶¶ 17, 19.[9] Rather, Sarviss argues, his job duties "began and ended with flying a helicopter on an as-needed basis" and that there is "no evidence that his 'discretion' extended beyond the physical operation of the helicopter." Pl.'s Opp'n at 10:21–22, 14:2–3. Additionally, Sarviss disputes the nature of certain of his more discretionary tasks, asserting that they were outside of his GDIT job duties.

■ Although the Court is inclined to find that Sarviss's employment involved significant discretion and independent judgment, the Court finds that the factual, factor-driven "discretion and independent judgment" has not been indisputably satisfied on this record. To the extent that Sarviss argues he provided no "training," the Court finds that his deposition testimony flatly contradicts such a statement, and disregards the paragraphs of his declaration that suggest otherwise. However, the Court finds that genuine issues remain as to whether his training required discretion and independent judgment or rather the application of highly technical training. Accordingly, the Court finds summary judgment inappropriate on this ground.

---

9. GDIT argues that the Court should disregard the Sarviss Declaration under the "sham declaration" rule. To the extent Sarviss flatly contradicts his deposition through his declaration, the Court disregards the declaration. As a whole, however, the Declaration does not clearly contradict his deposition testimony so much as it (arguably) clarifies what he meant.

### (B) Professional Exemption

Alternatively, GDIT argues that Sarviss performed one or more duties that fall under the professional exemption. An employee will be deemed a professionally-exempted employee where the employee's "primary duty is the performance of work" "[r]equiring knowledge of an advanced type in a field of science or learning customarily acquired by a prolonged course of specialized intellectual instruction" or "[r]equiring invention, imagination, originality or talent in a recognized field of artistic or creative endeavor." 29 C.F.R. § 541.300(a)(2)(i)-(ii). Under the "learned professional" prong of the exemption, work is exempt where it (1) requires advanced knowledge that is (2) in a field of science or learning and (3) is customarily required by a prolonged course of specialized intellectual instruction. 29 C.F.R. § 541.301(a). Work requires advanced knowledge under the exemption if it is "predominantly intellectual in character" and includes work "requiring the consistent exercise of discretion and judgment, as distinguished from performance of routine mental, manual, mechanical or physical work," in that an employee will generally use the advanced knowledge "to analyze, interpret or make deductions from the varying facts or circumstances." 29 C.F.R. § 541.301(b). Advanced knowledge is in a "field of science or learning" when that field is traditional, "as distinguished from the mechanical arts or skilled trades where in some instances the knowledge is of a fairly advanced type, but is not in a field of science or learning." Id. § 541.301(b). Additionally, exempt work is restricted to "professions where specialized academic training is a prerequisite for the entrance into the profession," as opposed to "occupations that customarily may be performed with only general knowledge acquired by an academic degree in any field, with knowledge acquired through an apprenticeship, or with training in the performance of routine mental, manual, mechanical or physical processes" or "occupations in which most employees have acquired their skill by experience rather than by advanced specialized intellectual instruction." Id. § 541.301(c)-(d).

Separately, the exemption also applies to "any employee with [(1)] a primary duty of teaching, tutoring, instructing or lecturing in the activity of imparting knowledge and [(2)] who is employed and engaged in this activity as a teacher in an educational establishment by which the employee is employed." 29 C.F.R. § 541.303(a); see id. § 541.303(d) ("The requirements of § 541.300 ... do not apply to the teaching professionals described in this section."). Exempt teachers explicitly include "aircraft flight instructors." Id. § 541.303(b); see also Paul v. Petroleum Equip. Tools Co., 708 F.2d 168, 170 n. 1 (5th Cir.1983) (under prior regulations, aircraft flight instructor "expressly falls within the professional exemption for teachers").

GDIT argues in the alternative that Sarviss performed duties that fell under the learned professional prong or that Sarviss performed exempt duties under this exemption through his role as a helicopter flight instructor. There is no genuine issue as to whether Sarviss instructed the other pilots. While Sarviss attempts to claim that his job "began and ended with flying a helicopter on an as-needed basis," see Def.'s Opp'n at 12, his deposition testimony makes clear (and supports no reasonable inference to the contrary) that he understood his job to be training helicopter pilots when he signed his contract, and that he did in fact train and instruct the Pakistani pilots, though classroom instruction took place on the ground with Landis.[10] Additionally, it is undisputed that

---

**10.** To the extent Sarviss's declaration suggests the contrary, it conflicts with his deposition

Sarviss was trained as an instructor pilot. DSUF ¶ 7; PSGI ¶ 7.

■ Generally, performing instruction is not sufficient to qualify for the teaching exemption because an employee must work at a formal educational institution. *See Hashop v. Rockwell Space Operations Co.*, 867 F.Supp. 1287, 1295 & n. 4 (S.D.Tex. 1994) (under prior version of regulation,[11] shuttle simulator instructors do not fall under teacher exemption because they weren't associated with educational establishment and were not certified). Where the highly paid employee exemption is at issue, however, an employee need only perform "one or more" exempt duties. By performing helicopter and NVG instruction, Sarviss satisfies the "one or more" requirement of the Highly–Paid Employee Exemption.

### iii. Primary Duty

Finally, the employee's "primary duty" must be the performance of office or non-manual work. Employees do not primarily perform office or non-manual work when those employees are, for example, "non-management production-line workers and non-management employees in maintenance, construction and similar occupations such as carpenters, electricians, mechanics, plumbers, iron workers, craftsmen, operating engineers, longshoremen, construction workers, laborers and other employees who perform work involving repetitive operations with their hands, physical skill and energy." 29 C.F.R. § 541.601(d). Such employees "are not exempt under this section no matter how highly paid they might be." *Id.* A "primary duty" is "the principal, main, major or most important duty that the employee performs," and should be determined on the basis of "all the facts in a particular case, with the major emphasis on the character of the employee's job as a whole." *Id.* § 541.700(a). Factors to consider

> include, but are not limited to the relative importance of the exempt duties as compared with other types of duties; the amount of time spent performing exempt work; the employee's relative freedom from direct supervision; and the relationship between the employee's salary and the wages paid to other employees for the kind of nonexempt work performed by the employee.

*Id.*

■ The Court finds that there are genuine issues of material fact as to whether Plaintiff's "primary duty" involved "office or non-manual work." Accordingly, the Court finds that summary judgment on this prong—and therefore on the Highly Paid Employee Exemption as a whole—is inappropriate.

### b. *Administrative Exemption*

Defendant alternatively argues that Plaintiff meets all of the requirements of the administrative exemption. For the reasons discussed above in subsection II(B)(1)(a)(ii)(A), genuine issues of material fact remain and make summary judgment inappropriate.

### 2. *Plaintiff's California Overtime and Meal and Rest Period Claims*

With respect to Plaintiff's California overtime and meal and rest period claims, Defendant moves for summary judgment

---

testimony and must not be considered.

11. The prior version of this regulation is relevant for comparison as the 2004 editorial adjustments were "not intended to cause any substantive changes" from prior version. *See* Department of Labor, "Defining and Delimiting the Exemptions for Executive, Administrative Professional, Outside Sales and Computer Employees," 68 Fed.Reg. 15560–01, 15568 (Department of Labor March 31, 2003).

on two basic bases. First, GDIT argues that the California Labor Code does not apply because the only services Plaintiff performed for Defendant were performed entirely outside of California. According to GDIT, both the presumption against the extraterritorial application of California laws and the Dormant Commerce Clause preclude the application of California law. Alternatively, GDIT argues that the California administrative exemption applies. The Court grants this portion of Defendant's Motion on the ground that California wage and hour law does not apply to Sarviss where he was performing services outside of California. Because Plaintiff does not seek compensation for overtime or missed meal and rest periods earned while he was in California, the Court grants summary judgment in favor of Defendant on the California overtime and meal and rest period claims. This holding does not address Plaintiff's wage statement and reimbursement claims to the extent they arise from the time period where Plaintiff was in California awaiting deployment.

### a. Applicability of California Labor Code

GDIT moves for summary judgment on Plaintiff's California claims on the ground that California wage and hour law cannot apply to Plaintiff's time in North Carolina, Texas, or Pakistan, i.e., the large majority of his roughly four-month employment with GDIT. GDIT argues that the extraterritorial application of California wage and hour law is inappropriate here because there is no indication that the California legislature attempted to overcome the presumption against extraterritorial application. Sarviss argues that the extraterritorial application of the law is unclear in his situation and that California's policy of

construing wage and hour laws broadly in favor of the employee should tip the scale in favor of extraterritorial application for California residents.

Sarviss appears to argue in his Opposition that he "perform[ed] part of [his] work in California." Pl.'s Opp'n at 21. His deposition makes apparent that he spent the time in California preparing for his trip by securing supplies. *See* DSUF ¶ 24; PSGI ¶ 24. The parties dispute whether this was part of his employment. PSGI ¶ 24; DRSUF at 25–26. Again, however, it is undisputed that Sarviss seeks overtime and payment for missed meal and rest periods only incurred outside of California. DSUF ¶¶ 25–26; PSGI ¶¶ 25–26.

California law contains a presumption against extraterritorial application of remedial statutes. As the California Supreme Court has put it:

> Although a state may have the power to legislate concerning the rights and obligations of its citizens with regard to transactions occurring beyond its boundaries, the presumption is that it did not intend to give its statutes any extraterritorial effect. The intention to make the act operative, with respect to occurrences outside the state, will not be declared to exist unless such intention is clearly expressed or reasonably to be inferred 'from the language of the act or from its purpose, subject matter or history.'

*North Alaska Salmon Co. v. Pillsbury,* 174 Cal. 1, 4, 162 P. 93 (1916), *reaffirmed in Diamond Multimedia Sys., Inc. v. Superior Court,* 19 Cal.4th 1036, 1059, 80 Cal. Rptr.2d 828, 968 P.2d 539 (1999).[12]

12. Of course, even if the California legislature intends for a statute to have extraterritorial application, that application may have limits imposed by the United States Constitution through, for example, the Supremacy Clause and/or the dormant Commerce Clause.

On the basis of the undisputed facts and the unclear law on these issues, the Court finds (1) that the presumption against extraterritorial application of California wage and hour law applies here and (2) that Sarviss does not fall under the presumptive application of the IWC wage orders reserved for California "wage earners." There is no "clear express[ion]" of extraterritorial application for California wage and hour laws. Although some provisions of the Labor Code appear to suggest that the Industrial Wage Commission's orders extend only to employment occurring in California, see Cal. Labor Code §§ 1173 & 1193.5 ("in this state"), the Labor Code also more generally provides that the Department of Industrial Relations is charged with "foster[ing], promot[ing], and develop[ing] the welfare of the wage earners of California," id. § 50.5. Even in light of this language, there is nothing in the statutory scheme itself that "explicitly defines or limits" the IWC's authority. Tidewater Marine W., Inc. v. Bradshaw, 14 Cal.4th 557, 577, 59 Cal.Rptr.2d 186, 927 P.2d 296 (1996).

The language of the wage orders and Labor Code sections leaves the presumption against extraterritorial application unrebutted, and the California Supreme Court has not decided whether the Labor Code's language or purpose impliedly suggests an intent to apply those laws to events occurring outside of California. In Tidewater, the California Supreme Court addressed whether California wage and hour law applied to California residents working in the Santa Barbara channel, including the issue of whether the Santa Barbara channel was part of California. It is perhaps undisputed here that "California employment laws implicitly extend to employment occurring within California's state law boundaries." 14 Cal.4th at 565, 59 Cal.Rptr.2d 186, 927 P.2d 296. With respect to employment outside the state's territorial boundaries, the Tidewater court first pointed to worker's compensation statutes in noting that "[i]n some circumstances state employment law explicitly governs employment outside the state's territorial boundaries." Id. at 577, 59 Cal. Rptr.2d 186, 927 P.2d 296.[13] Distinguishing explicit statutory language in the workmen's compensation scheme from the language in the IWC wage orders, the court left open room for statutory intent to be clarified:

> The Legislature may have similarly intended extraterritorial enforcement of IWC wage orders in limited circumstances, such as when California residents working for a California employer travel temporarily outside the state during the course of the normal workday but return to California at the end of the day. On the other hand, the Legislature may not have intended IWC wage orders to govern out-of-state businesses employing nonresidents, though the nonresident employees enter California temporarily during the course of the workday.

Id. at 577–78, 59 Cal.Rptr.2d 186, 927 P.2d 296. Overall, the court noted that it was "not prepared, without more thorough briefing of the issues, to hold that IWC wage orders apply to all employment in California, and never to employment outside California." Id. at 578, 59 Cal.Rptr.2d 186, 927 P.2d 296. Likewise, the court "express[ed] no opinion as to whether the trial court can enjoin the application of IWC wage orders to crew members who

---

**13.** E.g., Cal. Labor Code § 3600.5(a) ("If an employee who has been hired or is regularly employed in the state receives personal injury by accident arising out of and in the course of such employment outside of this state, he, or his dependents, in the case of his death, shall be entitled to compensation according to the law of this state.").

work primarily outside California's state law boundaries[.]" *Id.* at 579, 59 Cal. Rptr.2d 186, 927 P.2d 296.[14]

Though the *Tidewater* court suggested that there was nothing to overcome the presumption against extraterritorial application in the text and declined to directly address the issue, the court *did* explain that IWC wage orders presumptively *apply* to California wage earners. That is, though it did not decide the potential extraterritorial application of the IWC wage orders, the *Tidewater* court *did* find "California's territorial boundaries ... relevant to determining whether IWC wage orders apply." *Id.* at 578, 59 Cal.Rptr.2d 186, 927 P.2d 296. The court explained a potentially competing presumption: "[i]f an employee resides in California, receives pay in California, and works exclusively, or principally, in California, then that employee is a 'wage earner of California' and presumptively enjoys the protection of IWC regulations." *Id.* at 578, 59 Cal. Rptr.2d 186, 927 P.2d 296. The court then cited *United Air Lines, Inc. v. Industrial Welfare Com.*, 211 Cal.App.2d 729, 735, 748–749, 28 Cal.Rptr. 238 (1963), describing that case as "assum[ing] that IWC regulations apply to persons who are domiciled in California but work principally outside the state." *Tidewater*, 14 Cal.4th at 578, 59 Cal.Rptr.2d 186, 927 P.2d 296.[15] Because the *Tidewater* court found that the employees "reside[d] in California, receive[d] pay in California, and work[ed] in California," the court found that they were "wage earners of California" who "pre-

sumptively enjoy[ed] the protections of IWC wage orders." *Id.* at 578–79, 59 Cal. Rptr.2d 186, 927 P.2d 296.

Sarviss does not clearly fall into this "wage earner of California" presumption. Unlike in *Tidewater*, the three elements that would entitle Sarviss to presumptive application of the wage orders are not met here: although it is undisputed that he is a California resident who presumably received his pay in California (as he paid California taxes), he performed the significant majority of his employment *outside* of California. That is, it is undisputed that Sarviss did the work he was contracted to do, and spent between eighty and ninety percent of his roughly 16 working weeks, outside of California. Indeed, this case is also not one for which the *Tidewater* court particularly contemplated extraterritorial application. *See Tidewater*, 14 Cal.4th at 577–78, 59 Cal.Rptr.2d 186, 927 P.2d 296. Rather, this case appears to fall between the two *Tidewater* presumptions—the presumption against application to events occurring outside of California, on the one hand, and the presumption that wage earners of California do fall under the purview of the IWC wage orders. Put simply, the law is unclear on this issue.[16]

In *Guy*, the California Court of Appeal faced similar facts: one plaintiff was a resident of California but performed more than ninety percent of his work outside of California. 2004 WL 1354300 at *4. The court noted that the *Tidewater* court had expressly not addressed the applicability

**14.** Following *Tidewater*, there has been legislative silence on the issue of whether, how, or in what circumstances the IWC Wage Orders apply extraterritorially. On this point, the court finds the reasoning of the California Court of Appeal's unpublished decision in *Guy v. IASCO*, 2004 WL 1354300 (Cal.Ct.App. June 17, 2004), persuasive, even though that decision is not precedential.

**15.** *United Air Lines* found that California law did not apply because its application to flight attendants who worked almost entirely interstate would violate the dormant commerce clause.

**16.** Despite Plaintiff's assertion to the contrary, unclear law is not a "genuine issue of material fact" that would preclude summary judgment.

of the wage orders to a California resident who performed most of his work outside the state. *Id.* (citing *Tidewater*, 14 Cal.4th at 579, 59 Cal.Rptr.2d 186, 927 P.2d 296). Likewise, the *Guy* court avoided the "tough" issue by finding the application of the IWC wage order to that California resident barred by the dormant commerce clause. *Id.* at *4, *6–7.

■ The Court finds that the IWC wage orders do not apply to Sarviss in this case, even though he is a California resident. Rather, on the Court's reading of the jurisprudence, the determinative issue is whether an employee principally works in California. Although the cases discussing the extraterritorial application of California's wage and hour law are sparse, those decisions that *do* discuss it have tended to find that California wage and hour provisions do not apply to non-resident Californians who work primarily outside of California. *See Priyanto v. M/S Amsterdam, et al.*, 2009 WL 175739 (C.D.Cal. January 23, 2009) (Matz, J.); *Tidenberg v. Bidz. com*, 2009 WL 605249 (C.D.Cal. March 4, 2009) (Gutierrez, J.). Plaintiff emphasizes resident status as reason enough why those cases are distinct. Based on the Court's reading of the jurisprudence, however, the Court finds Judge Matz's approach, which focuses on *situs* of the employee's work, to be persuasive. *Priyanto*, 2009 WL 175739 at *6–*8. Although California will still have an interest in the working conditions of its residents, that interest is perhaps weaker where the individual neither "works exclusively, [nor] principally, in California." *See Tidewater*, 14 Cal.4th at 558, 59 Cal.Rptr.2d 186, 927 P.2d 296. The focus on situs of employment as opposed to residence of the employee or the employer is consistent with the decisions of California state courts and

from courts in jurisdictions outside of California. *See, e.g., Guillory v. Princess Cruise Lines, Ltd.*, 2007 WL 102851 (Cal. Ct.App.2007) (unpublished); *Peikin v. Kimmel & Silverman, P.C.*, 576 F.Supp.2d 654, 657 (D.N.J.2008); *see also Priyanto*, 2009 WL 175739 at *7–*8 (citing cases).

*Tidewater*'s citation to *United Air Lines, Inc. v. IWC*, 211 Cal.App.2d 729, 28 Cal.Rptr. 238 (1963), does not change this analysis. As mentioned above, after noting that a wage earner is presumptively entitled to the protection of IWC Wage Orders, the *Tidewater* court used a "Cf." cite to *United Air Lines*, and parenthetically described that case as "assum[ing] that IWC regulations apply to persons who are domiciled in California but work principally outside the state." *Tidewater*, 14 Cal.4th at 578, 59 Cal.Rptr.2d 186, 927 P.2d 296. The Court does not read this fleeting citation to suggest that the IWC wage orders presumptively apply to California residents primarily or exclusively working elsewhere. The context makes unclear whether the *Tidewater* court approved of the "assumption," but at least two facts suggest it did not: *Tidewater* expressly used a three-element definition of "wage earner" and *Tidewater* expressly left this precise issue open. Moreover, the Court notes that *United Air Lines* found such an application to be in violation of the dormant commerce clause.

In sum, because Sarviss indisputably spent the vast majority of his employment working *outside* of California—and, in fact, *relocated* to different states and a foreign country while outside of California [17]—the Court finds that the IWC wage order does not presumptively apply to that employment and that the presumption against

17. As opposed to "travel[ing] temporarily outside the state during the course of the normal workday but return[ing] to California at the

end of the day." *Tidewater*, 14 Cal.4th at 577–78, 59 Cal.Rptr.2d 186, 927 P.2d 296.

extraterritorial application of the wage orders has been left unrebutted.

■■■ Two additional issues further convince the Court that this holding is the appropriate one. First, in light of GDIT's dormant commerce clause argument, the principles that favor the avoidance of constitutional issues support this holding. The doctrine of constitutional avoidance counsels that "where an otherwise acceptable construction of a statute would raise serious constitutional problems, the Court will construe the statute to avoid such problems unless such construction is plainly contrary to the intent of Congress." *Edward J. DeBartolo Corp. v. Florida Gulf Coast Bldg. & Constr. Trades Council*, 485 U.S. 568, 575, 108 S.Ct. 1392, 99 L.Ed.2d 645 (1988). A court should invoke the doctrine only if it has "grave doubts about the constitutionality of [an application]." *Ileto v. Glock*, 565 F.3d 1126, 1143 (9th Cir.2009). As defendants have cited at least two cases where courts have found a violation of the dormant commerce clause through the extraterritorial application of IWC wage orders in comparable situations, the Court notes that the Court's interpretation avoids the potential dormant commerce clause issues that may arise from the application of California wage and hour law to a job that was performed almost entirely outside of California with team members from various states. Second, and relatedly, the Court notes that the majority of Sarviss's service for GDIT took place not only outside of California, but in a foreign country, working alongside individuals from various states.

In addition, the Court is not convinced that the state policy in favor of the broad application of wage and hour law tips the result in favor of Sarviss here. Because he is a resident and because California law is unclear on whether the law applies extraterritorially, Sarviss argues, public policy that favors the broad application of wage and hour law should tip the balance against summary judgment. In light of the presumption against extraterritorial application, however, a lack of clarity in the law should side with that presumption. Additionally, it is not clear that broad policy goes to extraterritorial application of those laws at all, as opposed to construction of the law once it clearly applies. *See Murphy v. Kenneth Cole Prods., Inc.*, 40 Cal.4th 1094, 1103, 56 Cal.Rptr.3d 880, 155 P.3d 284 (2007). Plaintiff has cited no case to the former effect, and the Court has not independently found one.

Again, Sarviss does not claim overtime or missed meal and rest periods for any of the time employed by GDIT where he was located in California. Because California law does not apply to Sarviss's claims for overtime and missed meal and rest periods, the Court grants summary judgment in favor of GDIT on those claims to the extent he brings them under California law.

### 3. *California Labor Code § 2802*

■■■ GDIT also moves for summary judgment on Plaintiff's California Labor Code § 2802 claim. Pursuant to California Labor Code § 2802, an employer must reimburse an employee "for all necessary expenditures or losses incurred by the employee in direct consequence of the discharge of his or her duties." Cal. Labor Code § 2802(a). There is a genuine issue of material fact as to whether the items purchased while he was in California waiting for deployment to Pakistan were purchased at the direction of his employer. DSUF ¶ 24; PSGI ¶ 24.[18] Accordingly, the Court denies that portion of Defendant's Motion.

---

**18.** Sarviss's use of the word "initiative" in his deposition is not dispositive of this issue.

## C. Conclusion

For the foregoing reasons, the Court denies GDIT's Motion for Summary Judgment on the FLSA claims, grants GDIT's Motion with respect to the California overtime and meal and rest period claims, and denies the Motion with respect to the remaining Labor Code claims.

## III. MOTION FOR CERTIFICATION OF COLLECTIVE ACTION (FLSA)

Sarviss moves for certification of a collective action with respect to the Third Cause of Action, which alleges a violation of the FLSA, 29 U.S.C. § 216(b). Plaintiff initially sought certification of an "opt-in" class consisting of:

> all natural persons who, at any time during the period from three years prior to the filing of this Complaint to the date of the filing of a motion for certification of a collective action, were or have been employed as persons governed by Industrial Welfare Commission Wage Order No. 4–2001 regulating wages, hours, and working conditions in the technical, clerical, mechanical, and similar occupations by Defendant and who did not receive or have not received overtime compensation as required by federal law.

*See* Pl.'s Mot. Cert. Collective Action ("Pl.'s Coll. Action Mot.") at 2. In his Reply, however, Plaintiff modified his request to a collective action class defined as:

> all natural persons, who, at any time during the period from three years prior to the filing of this Complaint to the date of filing of a motion for certification of a collective action, were or have been employed as GDIT helicopter pilots.

Pl.'s Coll. Action Reply at 1:13–26. Although GDIT did not have the opportunity to address this narrowed class definition in its papers, GDIT addressed it at length during oral argument.

## A. Legal Framework

Section 207 of Title 29 of the Unites States Code requires that employers pay non-exempt employees overtime. 29 U.S.C. § 207(a). Pursuant to § 216(b), an action to recover for failure to make overtime payments "may be maintained against any employer ... by any one or more employees for and in behalf of himself or themselves and other employees similarly situated." 29 U.S.C. § 216(b). Only employees who give their consent in writing— or "opt in"—will be represented parties. *Id.* This form of representative action is commonly referred to as a "collective action." "Because non-parties to a collective action are not subject to claim preclusion, giving notice to potential plaintiffs of a collective action has less to do with the due process rights of the potential plaintiffs and more to do with the named plaintiffs' interest in vigorously pursuing the litigation and the district court's interest in 'managing collective actions in an orderly fashion.'" *McElmurry v. U.S. Bank Nat'l Ass'n,* 495 F.3d 1136, 1139 (9th Cir.2007). District courts have considerable discretion in managing FLSA collective actions, including in determining how and when notice is provided to potential opt-in class members, *see Hoffmann–La Roche Inc. v. Sperling,* 493 U.S. 165, 171–73, 110 S.Ct. 482, 107 L.Ed.2d 480 (1989), and whether certification of a § 216(b) collective action is appropriate, *Leuthold,* 224 F.R.D. at 466.

## B. Discussion

### 1. *Applicable Standard*

The parties first dispute the standard that should apply to certification of a collective action here. Section 216(b) provides that a collective action may be maintained where the claimants are "similarly situated." The statute does not define the term "similarly situated," and as far as the

Court can tell, both the Supreme Court and the Ninth Circuit have yet to interpret the phrase. Although courts have taken a few different approaches to certification of a collective action, *see generally* 7B Charles Alan Wright, Arthur R. Miller & Mary Kay Kane, Fed. Prac. & Proc. § 1807, most courts interpreting § 216(b), including those in the Ninth Circuit and in California, have adopted a two-step approach. *See, e.g., Wynn v. Nat'l Broad. Co., Inc.,* 234 F.Supp.2d 1067, 1082 (C.D.Cal.2002); *Leuthold v. Destination America, Inc.,* 224 F.R.D. 462, 466–67 (N.D.Cal.2004); *see also* Newberg on Class Actions § 24:3 (4th ed.2008) ("Most courts have interpreted § 216(b) as requiring an analysis of whether plaintiffs are 'similarly situated' at two stages in the litigation: when notice to prospective class members is initially sought and then following discovery."); 7B Wright, Miller & Kane § 1807.

At the first stage, the court considers whether to certify a collective action and permit notice to be distributed to putative class members. *See Thiessen v. Gen. Elec. Capital Corp.,* 267 F.3d 1095, 1102 (10th Cir.2001). Courts making a notice-stage determination tend to require "nothing more than substantial allegations that the putative class members were together the victims of a single decision, policy, or plan." *Id.* (internal quotation marks omitted). A plaintiff "need not show that his position is or was *identical* to the putative class members' positions; a class may be certified under the FLSA if the named plaintiff can show that his position was or is similar to those of the absent members." *Freeman v. Wal–Mart Stores, Inc.,* 256 F.Supp.2d 941, 945 (W.D.Ark. 2003) (emphasis added). "While the standard for conditional approval at the stage of the litigation is lenient, it does require some evidentiary support. The lack of any evidence of similarity or even other potential class members precludes class certifi-

cation." *Bishop v. Petro–Chemical Transp., LLC,* 582 F.Supp.2d 1290, 1296 (E.D.Cal.2008); *see Bernard v. Household Intern., Inc.,* 231 F.Supp.2d 433, 435 (E.D.Va.2002) ("Mere allegations will not suffice; some factual evidence is necessary."); *Freeman,* 256 F.Supp.2d at 945; *Grayson v. K Mart Corp.,* 79 F.3d 1086, 1097 (11th Cir.1996) (plaintiffs may meet their burden "by making substantial allegations of class-wide [violations], that is, detailed allegations supported by affidavits which successfully engaged defendants' affidavits to the contrary" (internal quotation marks omitted)). Plaintiffs will be deemed similarly situated "when there is a demonstrated similarity among the individual situations[-]some factual nexus which binds the named plaintiffs and the potential class members together as victims of a particular alleged" policy or practice. *Bonilla v. Las Vegas Cigar Co.,* 61 F.Supp.2d 1129, 1138–39 n. 6 (D.Nev.1999) (internal quotation marks omitted).

The second stage often occurs at the conclusion of discovery. At that stage, courts use a stricter standard of "similarly situated" by reviewing several factors, including (1) disparate factual and employment settings of the individual plaintiffs; (2) the various defenses available to the defendant which appear to be individual to each plaintiff; and (3) fairness and procedural considerations. *Leuthold,* 224 F.R.D. at 467. Where significant discovery has been completed at the time of class certification, "some courts have skipped the first-step analysis and proceeded directly to the second step." *See Lockhart v. County of Los Angeles,* 2008 WL 2757080, Case No. CV 07–1680 ABC (PJWx), *4 (C.D.Cal.2008) (collecting cases); *Pfohl v. Farmers Ins. Group,* 2004 WL 554834, Case No. CV 03–3080 DT (RCx), *2–3 (C.D.Cal.2004). Those courts have relied in part on the degree of dis-

covery, including, for example, whether discovery as to class issues had been completed and whether discovery as to the existence of a corporation-wide policy had been conducted. *See Smith v. T–Mobile,* 2007 WL 2385131, Case No. CV 05–5274 ABC (SSx), *4 (C.D.Cal.2007).

■■■ Defendant argues that, because the parties have engaged in class-related discovery during the more than one year since this action has been filed, *see* Garrison Decl. ¶¶ 4–7, the Court should proceed directly to the heightened second step in assessing whether Sarviss has met his burden to show that certification is proper. In particular, GDIT notes that Sarviss did not seek to take depositions prior to the filing of his collective action certification motion, thousands of documents were produced through discovery, and no motions to compel were filed. *Id.* Sarviss notes that GDIT refused to produce much of the information it now claims is lacking from Plaintiff's motion, *see* Harris Decl. in Supp. of Reply, ¶ 3 & Ex. 2, and contends that GDIT should not be allowed to benefit from its refusal to provide such information, Pl.'s Reply Coll. Action at 3–4.

The Court will apply the two-tiered approach here, with some hesitation and with some modification. Although the lengthy time period for class discovery has closed, the Court generally will not allow a party to refuse discovery of certain issues and then use his opponent's lack of information on those particular issues as a central basis for proceeding with these issues.[19] Nevertheless, two issues provide the Court some pause. First, this is not a case where a plaintiff seeks certification within the first few months—or even within the

first *year*—after a case has been filed. The Scheduling Order contemplates the potential for class-related discovery prior to the filing of such a motion, and all indications are that the parties engaged in significant discovery. In such a context, the Court would expect the plaintiff to have access to *some* additional evidence to support his contentions—declarations, documents, or testimony. Second, although Sarviss cites to GDIT's responses to interrogatories, *see* Note 15, *supra,* Sarviss does not explain why he noticed no depositions or why documents produced through discovery were insufficient to address his concerns. The Court notes that the date on GDIT's responses to Plaintiff's interrogatories is November 20, 2008, which left Plaintiff with three months to seek additional information, reframe his requests, file a motion to compel prior to the original deadline for filing the instant motion, or seek an extension of the deadline. Harris Decl., Ex. 2 at 23–25.

In these circumstances, the Court does not find it appropriate to move directly to the second step and consider those factors in depth. That said, however, the Court will hold Plaintiff to the requirement that he put forth some evidence of similarity with potential class members and the existence of other potential class members. In other words, applying the two-tiered analysis does not exempt Sarviss from putting forth *some* evidence that there are other individuals who may be or have been similarly situated. This is especially the case here, where the class discovery period was specifically aimed at putting the parties in a position to meaningfully address class discovery.

---

**19.** Plaintiff has pointed to a number of responses to interrogatories that reflect a refusal by GDIT to provide certain information it deemed outside the scope of class discovery. While some of GDIT's objections on such a ground may have been well-taken, *e.g.,* Harris Decl., Ex. 2 at 5, 10, 13–18 (Interrogatories 2, 6, 8–13), other requests clearly sought class-discovery-specific information that GDIT now claims is missing, *see id.* at 19–22 (Interrogatories 15–20). Granted, there may have been other valid objections to those interrogatories.

### 2. *Plaintiff Has Not Met His Burden*

██ Even considering Plaintiff's narrowed collective action class against the low standard imposed by conditional certification, the Court finds Plaintiff's showing insufficient.

The Complaint alleges that GDIT improperly classified Sarviss and the putative class members as "exempt" and did not pay them overtime when they were frequently required to work over forty hours per week. Compl. ¶¶ 56–57. Plaintiff's narrowed definition of the putative opt-in class makes it plausible that, like him, other helicopter pilots were classified as exempt for similar reasons (and therefore their claims will be subject to similar defenses), and fell within the same department as Sarviss. *See* Def.'s Opp'n Coll. Action at 2–6. That said, allegations showing a plausible theory are not enough here.

In support of certification, Plaintiff submits evidence in the form of his own declaration that his experience working with other GDIT employees was that they worked more than eight hours per day and more than forty hours per week. Sarviss Decl. ¶¶ 4–5. To the extent these points are based on personal observation, the Court finds this evidence supportive of Plaintiff's motion.

Plaintiff's general statement about his observation of other GDIT "employees" does not get him far enough, however. Although Plaintiff has narrowed his class definition to other helicopter pilots, his declaration only addresses his experience and that he observed other "employees." His declaration does not suggest the specific context in which he observed other employees—i.e., in training or in Pakistan—and does not specify who those employees were or what positions they held. He has not provided evidence—including through his own declaration—that would support the existence of other helicopter pilots who deserved but were not paid overtime or who, by Plaintiff's observation, were employed in a similar role.[20] His declaration does not provide a *single* example aside from his own experience. Aside from his own declaration, Plaintiff has provided no additional evidence to support his claim that he is similarly situated (declarations from fellow pilots, for example), and the allegations in his Complaint are vague enough that they could be considered "substantial" only on a particularly generous reading. With multiple months to conduct class discovery, the Court cannot find this single, vague, general declaration sufficient to satisfy even the lower threshold of the first step of the analysis. The Court is mindful of Plaintiff's complaints as to the responses provided by GDIT in discovery, but the Court notes that Plaintiff had numerous mechanisms at

---

**20.** Evidence submitted in support of Defendant's Motion for Summary Judgment supports the existence of other helicopter pilots that worked with Mr. Sarviss as helicopter pilots in Pakistan. Thompkins Decl. ¶¶ 5, 9. (Though Plaintiff did not cite to this evidence—indeed, it was submitted *after* he filed his motion for class certification—he mentioned the other helicopter pilots at oral argument.) That evidence is not sufficient to establish the existence of a "similarly situated" class, however, because it does not address pilots who allegedly deserved overtime because of their work *in the United States*. Rather, it addresses pilots who worked in Pakistan but were from the United States. As the Court discussed in reference to Defendant's Motion for Summary Judgment, the FLSA does not apply to time worked overseas. Where Plaintiff has submitted no testimony specific to helicopter pilots and conclusory argument, the Court will not make inferential leaps to help him satisfy his burden. Additionally, the Court notes that while at oral argument Plaintiff sought to rely on Defendant's summary judgment evidence to support his certification motion, Plaintiff had objected to the use of this evidence in the Summary Judgment context. *See* PSGI ¶¶ 16, 27.

his disposal to marshal sufficient information to satisfy his burden to show that there are others similarly situated to him and that they were subject to a common policy.

### C. Conclusion

For the foregoing reasons, the Court denies the Motion for Certification of Collective Action. The Court does not hold that Plaintiff could not satisfy his burden under any showing, but merely that he has not done so here.

### IV. MOTION FOR CLASS CERTIFICATION (CALIFORNIA CLAIMS)

Plaintiff also moves for certification of a class action for two of the remaining California claims—those for improper wage statements and continuing wages—pursuant to Federal Rule of Civil Procedure 23. Sarviss initially sought to certify a class for the purposes of *all* California claims asserted in the Complaint. He defined the class as follows:

> all residents of the State of California who, at any time during the four years preceding the filing of the Complaint through the filing of a motion for class certification, received a pay stub or wage statement from the Defendant or its predecessor in interest, Anteon International Corporation.

Compl. ¶¶ 5, 21; Mot. Class Cert. at 1. In his Reply, however, Sarviss narrowed the proposed class to (1) a proposed Wage Statement Class based on the above class definition, and apparently limited to an allegation that the wage statements did not identify the name and address of the employer in the manner required by California Labor Code § 226 [21] and (2) a Final Wage Subclass, which includes "only those who are no longer employed by GDIT." Because Plaintiff's certification request initially included all of Plaintiff's California claims, Defendant's Opposition primarily addresses the class as initially framed. At oral argument, however, Defendant addressed the certification issues raised in Plaintiff's Reply at length.[22]

### A. Legal Standard

Pursuant to Federal Rule of Civil Procedure 23, a party seeking class certification must demonstrate that he has met each of the four requirements of Rule 23(a) and at least one of the requirements of Rule 23(b). *Lozano v. AT & T Wireless Servs., Inc.*, 504 F.3d 718, 724 (9th Cir.2007). Rule 23(a) sets out four prerequisites for a class action. Even if those prerequisites are satisfied, the party moving to certify must show that action falls into one of the "Types of Class Actions" maintainable, listed in subsection (b).[23] In assessing a

---

**21.** In addition to narrowing the claims for which he seeks certification to the Second and Sixth, it appears that Plaintiff has further narrowed the claims within the Second Cause of Action. In particular, it appears that Plaintiff has abandoned a request for certification with respect to (1) all wage statement issues *except* the legal name and address of the employer and (2) IWC Wage Order No. 4. *Compare* Compl. ¶ 52 (alleging broader violation, including by not showing itemized hours, and alleging a violation of both § 226 and IWC Wage Order No. 4), *with* Reply at 1 (limiting claim for certification to "identif[ication of] 'the name and address of the legal entity that is the employer'" under § 226).

**22.** Prior to oral argument, Defendant had not requested an opportunity to file a Sur–Reply.

**23.** Although Plaintiff purports to seek certification under all three paragraphs of Rule 23(b), the parties' arguments primarily address a(b)(3) action, which is typical for a class action seeking damages. Because the Complaint and arguments by Sarviss make clear that the money damages claim is not "secondary to [a] primary claim for injunctive or declaratory relief," the Court finds a(b)(2) class inappropriate and only addresses certification under (b)(3). *Molski v. Gleich*, 318 F.3d 937, 947 (9th Cir.2003). Sarviss does not respond to GDIT's challenge on this ground.

motion for certification, the court should engage in a "rigorous analysis." *See Gen. Tel. Co. v. Falcon,* 457 U.S. 147, 161, 102 S.Ct. 2364, 72 L.Ed.2d 740 (1982).

Although "the class determination generally involves considerations that are enmeshed in the factual and legal issues comprising the plaintiff's cause of action," *Coopers & Lybrand v. Livesay,* 437 U.S. 463, 469, 98 S.Ct. 2454, 57 L.Ed.2d 351 (1978), a court's review of the merits should be limited to those aspects relevant to making the certification decision on an informed basis. Fed.R.Civ.P. 23, Advisory Committee Notes, 2003 Amdts.; *see also Blackie v. Barrack,* 524 F.2d 891, 901 n. 17 (9th Cir.1975) ("The court is bound to take the substantive allegations of the complaint as true, thus necessarily making the class order speculative in the sense that the plaintiff may be altogether unable to prove his allegations. While the court may not put the plaintiff to preliminary proof of his claim, it does require sufficient information to form a reasonable judgment. Lacking that, the court may request the parties to supplement the pleadings with sufficient material to allow an informed judgment on each of the Rule's requirements."). That is, in determining the propriety of a class action, the question is not whether the plaintiff has stated a cause of action or will prevail on the merits, but rather whether the requirements of Rule 23 are met. *Eisen v. Carlisle & Jacquelin,* 417 U.S. 156, 178, 94 S.Ct. 2140, 40 L.Ed.2d 732 (1974). The court must accept as true the substantive allegations made in the complaint but need not "blindly rely on conclusory allegations which parrot Rule 23 requirements [and] may ... consider the legal and factual issues presented by [a] plaintiff's complaint." 2 Herbert Newberg & Alba Conte, Newberg on Class Actions (3d ed.) § 7.26.

**B. Discussion**

Plaintiff argues that his narrowed class definitions provide an appropriate basis for class certification because any class management issues are minimal with the narrowed claims. In opposing Plaintiff's Motion, GDIT emphasizes that, as a result of the company's reorganization, GDIT's multiple-thousand California employees were subject to different payroll and financial systems during different times and that Sarviss has not submitted any evidence showing how those different systems utilized policies consistent with each other and consistent with the paychecks he received for a limited period of time in 2007.

### 1. *Relevant Statutory Backdrop and Allegations*

Because certification depends both on the particular factual issues underlying a cause of action and on the nature of the cause of action itself, the Court briefly addresses the legal standards for the two relevant causes of action for which Plaintiff seeks class certification—the Second Claim for Relief and the Sixth Claim for Relief.

#### a. Failure to Provide Accurate Itemized Wage Statements

Plaintiff's Second Claim for Relief alleges that GDIT "failed to furnish Plaintiff and the Class Members with timely, itemized statements showing legal name and address of the employer, the total hours worked by each of them, and other, relevant data such as the applicable hourly rates." Compl. ¶ 52. Plaintiff alleges that GDIT thereby violated California Labor Code § 226 and/or IWC Wage Order No. 4. *Id.* ¶ 51.

As relevant here, California Labor Code § 226 requires "[e]very employer" to "furnish each of his or her employees ... an accurate itemized statement in writing showing ... (8) the name and address of the legal entity that is the employer[.]" Cal. Labor Code § 226(a)(8).[24]

___

24. To the extent Plaintiff still seeks to certify the class with respect to Wage Order No. 4,

### b. Continuing Wages

Plaintiff's Sixth Claim for Relief alleges that GDIT "has willfully failed to pay wages earned and unpaid promptly upon termination or resignation," in violation of California Labor Code §§ 201–202. Compl. ¶¶ 69–70.

Section 201 of the California Labor Code provides that when an employer discharges an employee, "the wages earned and unpaid at the time of discharge are due and payable immediately." Cal. Labor Code § 201(a). Section 202 of the California Labor Code provides for when payment of wages is due after resignation for an employee who does not have a written contract for a definite period. Cal. Labor Code § 202.

### 2. *Rule 23(a)*

With those causes of action in mind, the Court turns to the requirements of Federal Rule of Civil Procedure 23. Rule 23(a) contains four prerequisites to asserting a class action. Pursuant to Rule 23(a),

> [o]ne or more members of a class may sue ... as representative parties on behalf of all members only if:
>
> (1) the class is so numerous that joinder of all members is impracticable;
>
> (2) there are questions of law or fact common to the class;
>
> (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class; and
>
> (4) the representative parties will fairly and adequately protect the interests of the class.

Fed.R.Civ.P. 23(a). GDIT does not dispute numerosity,[25] but challenges whether

Sarviss has met his burden to show the remaining 23(a) prerequisites. The Court therefore addresses commonality, typicality, and adequacy of representation, below.

### a. *Commonality*

Rule 23(a)(2) requires that there be questions of law or fact common to the class. It "focuses on the relationship of common facts and legal issues among class members," and "has been construed permissively" such that "[t]he existence of shared legal issues with divergent factual predicates is sufficient, as is a common core of salient facts coupled with disparate legal remedies within the class." *Dukes v. Wal–Mart, Inc.*, 509 F.3d 1168, 1177 (9th Cir.2007) (quoting *Hanlon v. Chrysler Corp.*, 150 F.3d 1011, 1019 (9th Cir.1998)). Because the test is "qualitative rather than quantitative[,] one significant issue common to the class may be sufficient to warrant certification." *Id.* "Where the party opposing the class has engaged in some course of conduct that affects a group of persons and gives rise to a cause of action, one or more elements of that cause of action will be common to all of the persons affected." 1 Newberg on Class Actions (4th ed.) § 3:10.

In support of commonality, Plaintiff relies on his declaration, his wage statement, and evidence submitted by Defendant that explains the progress of different pay systems at different stages of the company's corporate form. Plaintiff argues that Defendant's evidence shows that a "single entity now prepares all GDIT wage statements." Reply at 3. Plaintiff emphasizes

---

the Court notes the following: IWC Wage Order No. 4, codified at Cal.Code Regs. tit. 8, § 11040 (hereinafter cited as 8 C.C.R. § 11040), provides that an employer must furnish an employee with "an itemized statement in writing showing ... (4) the name of the employer." 8 C.C.R. § 11040(7)(B)(4). Section 7 of Wage Order No. 4 does not apply

to "persons employed in administrative, executive, or professional capacities." *Id.* § 11040(1)(A).

**25.** The proposed class consists of over 2,500 employees. *See* 1 Newberg on Class Actions (4th ed.) § 3:5 (impracticability of joinder for classes in the hundreds and above "obvious").

that common legal questions include the nature of the damages and the statute of limitations. Additionally, Plaintiff reiterates his argument about troubles in getting class discovery.[26]

Defendant challenges Plaintiff's commonality showing. Defendant argues that Plaintiff's argument is conclusory, that Sarviss has not submitted any evidence to support commonality, and that GDIT has submitted evidence undermining the existence of common factual and legal issues. In particular, Defendant highlights that Plaintiff has not submitted evidence that reflects the pay stub received by any other class member.

With some hesitation, the Court finds Plaintiff's showing to be sufficient. Although the Court does not doubt that it makes *sense* for GDIT to have a common payroll system for California employees, Plaintiff's declaration and arguments standing alone would not be sufficient (as common factual issues) to support the certification of such a broad class in the face of Defendants' submissions showing that different employees were subject to different payroll systems because of the mergers and the existence of legacy employees. The threshold imposed by Rule 23(a), however, does not require that all or the majority of the issues be common to all class members. Because Sarviss has highlighted legal issues that are common, and in light of the lower threshold imposed by Rule 23(a), the Court finds that this showing is sufficient to satisfy the commonality requirement.

### b. *Typicality*

Plaintiff must also show that his claims are typical of the class. Typicality focuses on "the relationship of facts and issues between the class and its representatives." *Bishop v. Petro–Chem. Trans., LLC,* 582 F.Supp.2d 1290, 1307 (E.D.Cal.2008).

"Under the rule's permissive standards, representative claims are 'typical' if they are reasonably coextensive with those of absent class members; they need not be substantially identical." *Hanlon,* 150 F.3d at 1020; *see also* 1 Newberg on Class Actions (4th ed.) § 3:15 ("Typicality refers to the nature of the claim or defense of the class representative and not to the specific facts from which it arose or the relief sought. Factual differences will not render a claim atypical *if the claim arises from the same event or practice or course of conduct that gives rise to the claims of the class members, and if it is based on the same legal theory.*" (emphasis added)). For example, in *Dukes,* the Ninth Circuit found that the representative's antidiscrimination claims were typical of the class because, though the exact manifestation of the alleged discrimination might be different, all of the class members were allegedly victims of the same alleged violations—a discriminatory policy. *See Dukes,* 509 F.3d at 1184; *Bishop,* 582 F.Supp.2d at 1308. Where a representative's claims may be typical of *some* of the proposed class members but *atypical* of other of the proposed class members, courts have declined to certify. *See Bishop,* 582 F.Supp.2d at 1308.

The Court is not convinced that Sarviss has made this threshold showing for the large class he seeks to certify. Sarviss has argued that GDIT *currently* has a common payroll system that makes his claims typical; however, he has presented no evidence (even in his own declaration) showing that the payroll stub he received or payroll system to which he was subject was consistent with other class members' or consistent through the various relevant time periods. GDIT, on the other hand, has presented evidence showing that, in fact, *different* payroll systems existed for

---

**26.** *See* pp. 905–06 & n. 18, *supra.*

different employees during the relevant time period. The Court recognizes that Plaintiff's allegation is that all of the pay stubs during the time period violated the same statute. The Court also recognizes that it is plausible that Plaintiff's claims are typical of *some* other class members: GDIT's evidence suggests that individuals in certain groups were treated to a common payroll system. *See* Breen Decl. ¶¶ 14–17. In light of Plaintiff's broad class definition, however, Plaintiff has not made a sufficient showing of a common course of conduct by GDIT during the class period or across employees. As a result, Plaintiff's conclusory allegations and arguments are not sufficient to satisfy the Court that Plaintiff's claims about wage statements are in fact typical of other class members'. For example, Plaintiff's wage statement allegations appear to rest on the disclosure of the employer name and the itemization of hours. Where different company names might be involved, however, and/or a different means of generating pay stubs, the proposed class appears too broad under the current showing to satisfy the Court.

Put simply, Sarviss essentially seeks to rest on his allegations that there was a common course of conduct and that none of the payroll stubs during the class period used the appropriate name. If the parties had not engaged in class discovery for six months, the Court would be inclined to accept this allegation as true at this stage. That argument cannot be sufficient, however, where (1) Sarviss has had the opportunity to engage in significant discovery, (2) GDIT has presented evidence that different payroll systems existed at different times and for different employees, and (3) Sarviss has not suggested this is informa-

tion that he was unable to acquire through discovery.[27] Again, Plaintiff's motion rests on his declaration (which only addresses his experience), the declaration of his counsel, and the declaration of a consultant as to damages calculations.[28] This showing is simply insufficient in light of Defendant's showing to convince the Court that Plaintiff's claims are typical of the broadly-framed class. The Court does not suggest, of course, that Plaintiff could not show, with more evidence, that his claims are typical of the broader class, that Plaintiff could not show his claims were typical of a narrower class, or that sub-classes with different class representatives were appropriate. On the particular certification request and briefing before the Court, however, the Court is hesitant to find that Plaintiff has made a threshold showing that his claims are typical of other members of the proposed Wage Statement Class *or* of the Final Wage Subclass. That said, because the Rule 23(a) requirements provide a relatively low threshold, the Court will address the other Rule 23 requirements.

#### c. *Adequacy of Representation*

"The final hurdle interposed by Rule 23(a) is that 'the representative parties will fairly and adequately protect the interests of the class.'" *Hanlon*, 150 F.3d at 1020 (quoting Fed.R.Civ.P. 23(a)(4)). This requirement, which addresses due process concerns, turns on the satisfaction of two questions: (1) whether the named plaintiffs and their counsel have any conflicts of interest with other class members and (2) whether the named plaintiffs and their counsel will prosecute the action vigorously on behalf of the class. *Id.* In light of

---

**27.** Again, while the Court understands Plaintiff's concern regarding discovery, the Court notes that Plaintiff had numerous avenues through which to enforce its entitlement to certain discovery or otherwise obtain information it would need to meet its burden.

**28.** The declaration of Plaintiff's counsel provides a conclusory, self-serving statement about the predominance of certain issues purportedly based on his experience. *See* Harris Decl. ¶ 2. The consultant's declaration is similarly unhelpful with the typicality analysis.

the narrowed issues for which Plaintiff seeks certification, perhaps two adequacy of representation concerns exist: (1) Plaintiff potentially was under a different scheme than other members of the class he seeks to certify and (2) Plaintiff seeks to represent both past and current employees, while he himself is a past employee. The Court nevertheless sees no conflict of interest in Plaintiff's representation of all such employees, as the allegation is that each type of payroll system violated California law, and the relief Plaintiff seeks for such claims—damages—will be common to all such individuals. The latter inquiry "is directed to the vigor with which the named representatives and their counsel will pursue the common claims," and primarily considers the competency of counsel. *Id.* at 1021. Court is satisfied that class counsel is qualified and that counsel and Sarviss will pursue the action vigorously. Harris Decl. ¶ 2. Overall, then, the Court is satisfied that Plaintiff would be an adequate representative.

### 3. *Rule 23(b)(3)*

Even if the Court were satisfied that Plaintiff had satisfied Rule 23(a)'s prerequisites for class certification, the Court would not be satisfied that Plaintiff has met its burden to show that common questions predominate. Pursuant to Federal Rule of Civil Procedure 23(b)(3), a class action may be maintained if the requirements of Rule 23(a) are satisfied and if:

> the court finds that questions of law or fact common to class members predominate over any questions affecting only individual members, and that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy.

Fed.R.Civ.P. 23(b)(3). The Rule also provides a framework for making that assessment. In particular, it lists as "matters pertinent to these findings":

> (A) the class members' interests in individually controlling the prosecution or defense of separate actions;
>
> (B) the extent and nature of any litigation concerning the controversy already begun by or against class members;
>
> (C) the desirability or undesirability of concentrating the litigation of the claims in the particular forum; and
>
> (D) the likely difficulties in managing a class action.

*Id.*

■■■ The Court is not convinced that the requirements of (b)(3) are satisfied with respect to either the proposed Wage Statement Class or the Final Wage Subclass. With respect to certification of the proposed Wage Statement Class for the purposes of Labor Code § 226, the Court notes that the narrowed claims on which Plaintiff seeks certification go far in streamlining the issues likely to be raised for determination. For similar reasons as discussed above in the slightly different context of typicality, however, the Court is not satisfied on this showing that certification of such a broad class is appropriate. Plaintiff's showing does not give a clear indication, for example, of how many different types of pay stubs the Court will need to address given the lengthy time period on which Plaintiff seeks certification and the various payroll policies that were apparently in place for different types of California employees during that period.[29]

---

**29.** To the extent Plaintiff still seeks certification on potential violations of IWC Wage Order No. 4, the Court notes that it is even less convinced that common issues predominate.

As noted above, the relevant provisions of Wage Order No. 4 do not apply to exempt employees, which would require a separate analysis of multiple hundreds of jobs.

As mentioned above, the Court does not suggest that Plaintiff would not be unable to certify a narrower class—or this class on a different showing; rather, the Court simply holds that, on the information before it, it cannot certify the proposed class.

 With respect to the proposed Final Wage Subclass, the Court's concerns are perhaps even greater. Where multiple hundreds of jobs and contracts are potentially at issue, the Court is not satisfied on Plaintiff's conclusory showing that common issues will predominate over individual ones. In particular, the Court sees as potentially predominating individual issues the exact circumstances of what was owed under an employee's particular contract and whether or not certain kinds of payments are "owed" under different contracts or under the law for different positions—issues that bear on liability and damages under the relevant Labor Code sections.[30] To the extent, for example, that Plaintiff claims the wages due and unpaid to him are overtime wages, an individual determination of whether there are in fact any wages owed might rest on whether Plaintiff is an exempt employee. Calling such issues simply damages calculations, Plaintiff appears to suggest that such issues are easily amenable to class treatment. Although the Court does not doubt that the existence of simple calculations would not undermine certification, the Court views the potential issues here (at least as Plaintiff has defined the class) as a different matter: because of the broad range of employees, the issues do not simply encompass calculation, but also entitlement. Accordingly, the Court is not convinced that common issues predominate.

### C. Conclusion

In light of the concerns discussed above, the Court finds that Plaintiff has not met his burden to show that the requirements for class certification are satisfied here. The Court therefore will not certify the class action on this showing. Additionally, the Court notes that it does not have sufficient information before it to propose its own, narrower class.

## V. CONCLUSION

For the foregoing reasons, the Court GRANTS IN PART AND DENIES IN PART Defendant's Motion for Summary Judgment, DENIES Plaintiff's Motion for Certification of Collective Action, and DENIES Plaintiff's Motion for Class Certification.

IT IS SO ORDERED.

---

**30.** The description of Plaintiff's own contract provides an example. In this case, Plaintiff was paid a "completion bonus." Although there was apparently no dispute between GDIT and Plaintiff that he earned his completion bonus, to the extent such an issue is disputed for a different employee who has resigned, an individual contract interpretation could be required.