Todd SHOOK and Herschel Berringer, on behalf of himself and others similarly situated, and on behalf of all other "aggrieved" employees, Plaintiffs,

v.

INDIAN RIVER TRANSPORT CO., a Florida Corporation, Defendants.

CIV. NO. 1:14–1415 WBS BAM

United States District Court, E.D. California.

Signed 02/15/2017

See also: 72 F.Supp.3d 1119.

Aashish Y. Desai, Desai Law Firm, P.C., Costa Mesa, CA, for Plaintiffs.

Richard H. Rahm, Alexandra Hemenway, Andrew Michael Spurchise, Littler Mendelson, P.C., San Francisco, CA, Britney Noelle Torres, Kelsey Elizabeth Papst, Littler Mendelson, P.C., Michelle L. Christian, Seyfarth Shaw LLP, Sacramento, CA, for Defendants.

## MEMORANDUM OF DECISION, FINDINGS OF FACT AND CONCLUSIONS OF LAW

WILLIAM B. SHUBB, UNITED STATES DISTRICT JUDGE

Plaintiffs, truck drivers formerly employed by Indian River Transport Co. ("Indian River"), brought this action on behalf of themselves and similarly aggrieved employees against Indian River alleging various violations of California law, including 1) Labor Code § 226.7 (failure to provide mandated rest breaks); 2) Labor Code § 226(a) (failure to provide accurate itemized wage statements); 3) Labor Code §§ 2699, et seq. (California Private Attorneys General Act ("PAGA")) (failure to separately compensate for rest breaks and unpaid wages); 4) Business & Professions Code § 17200 (California Unfair Competition Law); 5) Labor Code §§ 201 and 203 (failure to compensate employees for non-driving work before and after employees' shifts and failure to timely pay compensation and wages to former employees); and 6) Labor Code § 226.2 (failure to provide accurate itemized wage statements and separately compensate for rest and recovery periods and other nonproductive time). The gravamen of their claims is that Indian River violated the California Labor Code by not providing its drivers with rest breaks, not compensating them for rest breaks and other time they were working but not driving, and by providing them with wage statements that did not include all the information required by the Labor Code.

After a two-day bench trial and extended closing arguments, the matter was submitted to the court for decision. Having considered the evidence and arguments of counsel, and having read and considered the briefs, the court finds in favor of defendant Indian River on all claims. This memorandum constitutes the court's findings of fact and conclusions of law pursuant to Federal Rule of Civil Procedure 52(a).

I. Findings of Fact

1. Plaintiffs Shook and Berringer and other aggrieved employees are current and former California–resident drivers ("California drivers") employed by Indian River.

2. Plaintiff Shook worked for Indian River from May to October 2012 and plain-

tiff Berringer worked for Indian River from November 2012 to January 2014.

3. Plaintiffs paid California state income taxes on all their earnings for Indian River. Plaintiffs also received all their Indian River wage statements in California.

4. Indian River is a Florida corporation with its headquarters in Winter Haven, Florida. Indian River offers liquid food-grade tank carrier services nationwide, transporting products such as milk and orange juice.

5. Indian River's administrative staff and management are located at Indian River's headquarters in Winter Haven. The headquarters is responsible for payroll and other back office functions, including the issuing of wage statements and the resulting electronic deposits of paychecks, and drivers are hired out of Winter Haven and trained there. The Winter Haven facility also has a tank wash and maintenance facilities. The Winter Haven facility provides 24-hour dispatch service, including for drivers in the western United States after hours.

6. Indian River provides transportation services across the country. Drivers typically spend several days or weeks away from home, during which they pick up and drop off product between suppliers and recipients that are 1–5 days apart. The area where a driver has his or her residence will normally determine only the beginning and end of the overall trip. Thus, a driver who lives in California will usually begin and end his or her overall trip in California but may spend the majority of that time outside California. Indian River has about 25 customers in California.

7. Although Indian River dispatches most of its trucks out of it headquarters in Winter Haven, it has facilities in Clovis, New Mexico and in Turlock, California,

with dispatchers in both locations. There are no drivers based in the Turlock facility, and its California drivers live throughout California. The Turlock facility, which is much smaller than the Winter Haven facility, provides light maintenance for Indian River trucks and has two dispatchers and only a few other employees. The Turlock facility also has a small lounge that drivers may use and parking spots where drivers can leave their trucks after hours. Drivers may also send paperwork to Indian River's headquarters from the Turlock facility, though they were not required to do so and could submit some, if not all, paperwork at commercial truck rest stops across the country. The Turlock facility does not have shower facilities or an indoor restroom for drivers, who may use a single portable toilet outside the facility.

8. Indian River hires and employs drivers nationwide, of which there are 600–650 at any time. In 2016, Indian River had approximately 50 drivers at any particular time who were residing in California. Indian River drivers are dispatched based upon freight demands and the location of drivers at the time of demand, not their place of residence. Defendant estimates that based on fuel and tax records, Indian River drivers, including those living in California, spend on average 15–30% of their time driving in California.

9. While some California drivers spend almost no time in California, others spend nearly half their time in the state in any particular pay period. These figures vary from driver to driver and from one week to the next, depending on driver preferences and demand.

10. Until September 5, 2016, all Indian River drivers throughout the United States were generally only paid "piece-rate" or per mile driven, at a rate of approximately $.41 per mile. Plaintiffs and other drivers were not separately paid for

rest breaks or paid for rest breaks at all. Plaintiffs were also not paid for other "nonproductive" time related to their work as drivers, including time spent on pre- and post-trip safety inspections, fueling, loading and unloading, waiting time before loading and unloading, tank washes, and waiting time before the tank washes. Defendant's compensation system was the same for all of its drivers.

11. Until September 5, 2016, Indian River wage statements identified the dates of each trip during the weekly pay period, and the rate and dollar amount paid for that trip. The wage statements did not list the actual hours worked, whether driving, on duty but not driving, or while on break, though drivers recorded such time on daily logs. The wage statements also did not list any hourly rates for drivers, with the exception of certain hourly work not at issue in this case. (See Pls.' Exs. 1–2.)

12. Indian River drivers were informed of their obligations to comply with federal regulations regarding rest breaks and the penalties that would result from failure to comply. Specifically, drivers were informed of federal regulations requiring drivers to take a 30–minute, off-duty break within 8 hours of coming on duty, to not exceed more than 11 hours of driving in a 14–hour period, and to be off-duty for at least 10 hours after 14 hours of work. Drivers were also informed of federal regulations prohibiting working more than 70 hours in an 8–day period. Drivers were also required to maintain 30–day and daily logs (prior to the implementation of electronic logs) recording hours driving, hours on-duty but not driving, and hours off-duty. Indian River drivers were warned of the punishments that Indian River would impose for failure to comply with federal regulations. (See, e.g., Pls.' Ex. A–10 (Indian River employee handbook).)

13. Defendant did not schedule rest breaks for its drivers, as drivers were permitted and encouraged to take rest breaks for safety and comfort reasons when they wanted. Defendant's rest break policy was the same for all its drivers, and Indian River drivers understood that they were free to take breaks as desired.

14. Indian River did not discourage its drivers from taking rest breaks. In that regard, the court does not find the testimony of Jeffrey Pilon credible to the extent that he claimed he was punished four times in connection with taking rest breaks. Even assuming Mr. Pilon was punished in connection with his rest breaks as he claimed, those isolated episodes do not establish that Indian River discouraged any other drivers from taking rest breaks, including plaintiffs Shook and Berringer. The court finds the testimony of all other witnesses to be substantially credible.

15. Indian River drivers were not specifically informed of California law regarding rest breaks prior to September 5, 2016. However, plaintiffs' Complaint does not assert any cause of action based on Indian River's failure to inform plaintiffs or its California drivers of California law regarding rest breaks. Nor does their Complaint raise any allegation to that effect.

16. On September 5, 2014, plaintiffs filed the present action against Indian River.

17. On June 27, 2016, Indian River provided written notice to the California Department of Industrial Relations of its intent to make payments to current and former California drivers under California Labor Code § 226.2's "Safe Harbor" provision. (See Def.'s Ex. F–1.)

18. Indian River modified its compensation and payroll system for California drivers on September 5, 2016 in order to comply with California law. Indian River

reduced the piece-rate paid per mile from $.41 to $.14 and now compensates its California drivers separately for rest periods and other nonproductive time at $11.00 per hour. The transition to the new compensation structure and payroll system, in order to separately track, account for, and pay for productive and nonproductive time, was a lengthy process. The court does not find that the delay in transitioning to this new compensation and payroll system was unreasonable, given the substantial changes to defendant's payroll structure that had to be implemented during that period of time.

19. This change in compensation structure was not well-taken by Indian River's California drivers, with approximately 20% resigning, leaving Indian River with approximately 35 California drivers in 2017.

20. Since September 5, 2016, Indian River's rest-break policy specifically informs drivers who live in California of their rights to take breaks under California law, and it now separately pays for rest breaks.

21. On December 15, 2016, pursuant to section 226.2's Safe Harbor provision, Indian River paid its current and former California drivers (including plaintiffs) 4% of their gross wages from July 1, 2012 to December 31, 2015, which totaled approximately $282,000. (Def.'s Ex. F.) Indian River did not reduce the amount of the Safe Harbor payment based on the percentage of time its drivers worked outside of California. The only drivers who did not receive such payment were drivers for which the payments were returned by the U.S. Mail due to lack of a current address.

22. Indian River did not make any payments to its drivers for any violations of the California Labor Code's rest break and wage requirements occurring after January 1, 2016.

23. Although plaintiffs' Complaint was filed as a class action on behalf of all California drivers, plaintiffs did not move for class certification under Federal Rule of Civil Procedure 23. At trial, plaintiffs sought civil penalties for themselves and other California drivers under PAGA, Cal. Labor Code §§ 2698–2699.5, as well as statutory penalties and damages in their individual capacity.

## II. Conclusions of Law

### A. Work Performed Outside California

The California Supreme Court has explained that there is a presumption against the extraterritorial application of California law, under which a court should presume the California legislature "did not intend a statute to be operative, with respect to occurrences outside the state, unless such intention is clearly expressed or reasonably to be inferred from the language of the act or from its purpose, subject matter, or history." Sullivan v. Oracle, 51 Cal.4th 1191, 1207, 127 Cal.Rptr.3d 185, 254 P.3d 237 (2011) (citation and internal punctuation omitted). This presumption applies "in full force" to California's Unfair Competition Law, as "[n]either the language of the UCL nor its legislative history provides any basis for concluding the Legislature intended the UCL to operate extraterritorially." Id.

California law is unclear as to exactly what a California resident must show in order to overcome this presumption and invoke the protection of the California Labor Code's rest break and wage requirements extraterritorially. See Sarviss v. Gen. Dynamics Info. Tech., Inc., 663 F.Supp.2d 883, 898–99 (C.D. Cal. 2009) ("There is no 'clear express[ion]' of extraterritorial application for California wage and hour laws.").

Neither the California Supreme Court nor the Ninth Circuit have established a test for determining when the provisions of the California Labor Code might apply to work performed outside the territorial boundaries of the state. Lower courts addressing the question examined factors such as the nature of the work being performed, the amount of work being performed in California, the residence of the employee, the residence of the employer, whether the conduct which gives rise to liability occurred in California, and the employer's ties to the jurisdiction. See Oman v. Delta Air Lines, Inc., Case No. 15-cv-00131-WHO, 2017 WL 66838, *5–7, 230 F.Supp.3d 986, 991-94 (N.D. Cal. Jan. 6, 2017); Bernstein v. Virgin Am., Inc., Case No. 15-v-02277-JST, 2017 WL 57307, *7, 227 F.Supp.3d 1049, 1062-63 (N.D. Cal. Jan. 5, 2017); Ward v. United Airlines, No. C 15-02309, 2016 WL 3906077, *3–5 (N.D. Cal. July 19, 2016); Sarviss, 663 F.Supp.2d at 900.

Looking at these factors, the court in Oman v. Delta Air Lines, Inc., 2017 WL 66838, at *5–7, 230 F.Supp.3d at 991-94, held that extraterritorial application of certain California Labor Code requirements to California–resident flight attendants was not permissible where the flight attendants spent 14% or less of their time in California, the employer was not based in California, and the nature of the work required working in multiple other jurisdictions in a given pay period or day.

Similarly, the court in Ward v. United Airlines, 2016 WL 3906077, at *3–5, held that the extraterritorial application of California wage statement requirements to California–resident pilots was impermissi-

ble where the pilots spent an average of 12% of their total work time in California, notwithstanding the issuance of the wage statements in California. In making this determination, the court focused on where the employee "principally worked," rejecting plaintiffs' argument that the pilots' residency was dispositive.[1] See also Sarviss, 663 F.Supp.2d at 900 (holding that certain California wage orders did not apply to a California resident because he did not principally work in California).

On the other hand, the California Supreme Court has observed that in some circumstances the Legislature has explicitly extended application of its statutes outside the state's territorial boundaries and may have so intended in other instances. See Tidewater Marine W., Inc. v. Bradshaw, 14 Cal.4th 557, 577–78, 59 Cal. Rptr.2d 186, 927 P.2d 296 (1996) (state employment law explicitly governs employment outside the state's territorial boundaries in some circumstances, and "[t]he Legislature may have similarly intended extraterritorial enforcement of [Industrial Welfare Commission] wage orders in limited circumstances, such as when California residents working for a California employer travel temporarily outside the state during the course of the normal workday but return to California at the end of the day.").

Specifically, the court noted in Tidewater that employees who reside in California, receive pay in California, and work exclusively or principally in California are "wage earner[s] of California" who presumptively enjoy the protections of the state's IWC regulations. Tidewater, 14

---

1. The court in Ward, 2016 WL 3906077, at *3–5, did not distinguish between work performed inside California and work performed outside California, given its determination that a certain Labor Code section did not apply at all to employees who principally worked outside California. The court assumes, without deciding, that the California Labor Code's wage and rest break provisions apply to work performed by California residents inside California.

Cal.4th at 578–79, 59 Cal.Rptr.2d 186, 927 P.2d 296; accord Sullivan, 51 Cal.4th at 1197–1206, 127 Cal.Rptr.3d 185, 254 P.3d 237 (California overtime law applies to all work within its borders, with the possible exception of work by non-resident employees who enter California temporarily during the course of the workday).

There is no evidence that plaintiffs in this case worked exclusively or principally in California. Such evidence as was presented was to the contrary. It is apparent from the undisputed evidence that the majority of the drivers' time working was spent outside California. While California drivers' overall routes usually began or ended in California, the drivers would spend days, weeks, or even months on the road working outside of California. In other words, the California drivers worked principally outside of California.

Courts have also given substantial weight to the fact that the employer is based in California or receives subsidies or other benefits for its California–related work in determining whether its California employees are covered by California laws while working outside the state. For example, in Bernstein v. Virgin America, Inc., 2017 WL 57307, at *4–8, 227 F.Supp.3d at 1058-64, the court in the Northern District held that extraterritorial application of the California Labor Code to California–resident flight attendants who spent about 25% of their time in California was permissible where the employer was based in California, had its headquarters in California, and had received substantial state subsidies to train its flight attendants; 88–99% of the employer's flights each day either departed or arrived in a California airport; and the wrongful conduct, e.g., the issuance and application of compensation policies, emanated from California.

In the present case, in contrast, defendant was neither based nor had its head-

quarters in California. Such evidence as was presented, again, was to the contrary. It appears from the undisputed evidence adduced at trial that Indian River was headquartered in Florida, sent drivers payments from that headquarters, and had most of its facilities at that headquarters. Indian River's compensation structure and rest break policies were developed and applied at Indian River's headquarters in Florida and it trained new employees in Florida.

Plaintiffs talk about the Turlock facility as if it were somehow defendant's headquarters. The evidence at trial could not have been more to the contrary. What the court learned from the evidence about that facility was that it employed only two dispatchers, performed only minor maintenance, and had a small lounge and space for parking trucks. Apparently, no routes involved the facility, as loading and unloading occurred at the customer's businesses. The facility had no permanent bathroom or shower facilities for drivers. Only a single outdoor porta potty was provided. Finally, while drivers could submit their paperwork to Indian River from the Turlock facility, they were not required to do so and could submit some, if not all, paperwork at commercial truck rest stops across the country.

Thus, because plaintiffs did not work exclusively or principally in California, and defendant was not based or headquartered in California, this case is unlike either Tidewater or Bernstein, and the court must look to the other factors considered by other courts to determine whether plaintiffs have met their burden of overcoming the presumption against extraterritorial application of the California laws in this case.

Plaintiffs did establish that they were residents of California, received their wages and wage statements in California,

and paid their taxes to the State of California. What is clear to the court from the case law, however, is that the mere residency of the plaintiffs in California is insufficient in itself to entitle them to the benefits of the California wage and hour provisions while they are working outside the state. See, e.g., Sarviss, 663 F.Supp.2d at 900 (noting that the focus on situs of employment as opposed to residence of the employee is consistent with the decisions of California state courts); Ward, 2016 WL 3906077, at *3–5 (same). The California drivers' receipt of wages and wage statements in California is simply a consequence of the drivers' California residency if their wage statements are mailed to their mailing addresses in California. Similarly, California drivers' payment of California income taxes, which has never been discussed as a relevant factor in any authority cited to the court, is also a result of the drivers' California residency.

Beyond showing their California residency, plaintiffs have shown very little in their attempt to overcome the presumption against extraterritorial application of the California laws relating to wages and rest breaks to them while working outside of California. The nature of the work being performed, truck driving, adds nothing to the analysis. The conduct which gave rise to the alleged liability was Indian River's practice with regard to wages and rest breaks, which can best be inferred to have been devised and implemented in Indian River's corporate offices in Florida.

Plaintiffs point to evidence that Indian River has about 25 customers in California, and the drivers sometimes completed paperwork in and/or sent paperwork to Indian River from California. However, because the evidence at trial did not establish how much business Indian River conducts in California or nationally, the court cannot draw any significance from the fact of those 25 customers. The drivers may have sometimes turned in the hard copies of their paperwork at the Turlock facility, but the court gathered from the evidence that the electronic submission, which they could submit from stations in various parts of the country, was the significant transmittal.

From the evidence adduced at trial, the court concludes that the presumption against extraterritorial application of California's wage and rest break laws to Indian River's California drivers' work outside California is not overcome. Thus, California's wage and rest break laws do not apply to Indian River's drivers' work performed outside California, and Indian River is entitled to judgment on all of plaintiffs' causes of action with respect to work performed outside California.

## B. Work Performed in California

■ Assuming the California Labor Code's wage and rest break provisions apply to work performed in California by Indian River's California drivers,[2] plaintiffs have not met their burden of establishing when any Labor Code violations occurred or what the resulting penalties or damages should be. Thus, plaintiffs' claims, with respect to work performed in California, fail due to lack of sufficient proof.

Prior to trial, the parties were directed to submit proposed findings of fact and

---

**2.** While the California Supreme Court has specifically stated that California overtime law applies to all work within its borders, with the possible exception of work by nonresident employees who enter California temporarily during the course of the workday, Sullivan, 51 Cal.4th at 1197–1206, 127 Cal. Rptr.3d 185, 254 P.3d 237, it has not addressed whether the California Labor Code's rest break and wage requirements apply to all work within its borders.

conclusions of law and a proposed form of judgment. Plaintiffs' submissions, however, made no effort to calculate or even estimate of the number of violations or amount of penalties or damages. At trial, counsel for plaintiffs assumed and argued that California law applied to all work performed by all California drivers, regardless of the location, and assumed that damages and penalties could be determined simply by estimating the amounts of time spent on various categories of nonproductive work per pay period and looking to the number of pay periods worked by each employee.

However, it appears from the evidence that California drivers spent most and sometimes all of their time in a given pay period outside of California. Thus, plaintiffs' estimates regarding total nonproductive time in a given pay period and the total number of pay periods without reference to where that time was spent are of no assistance to the court.

It would be reasonable to assume that plaintiffs spent some time working in California during the relevant time period. But it is not for the court to speculate on how many, if any, uncompensated rest breaks or other breaks occurred while they were in California. It was plaintiffs' burden to establish that by competent evidence, such as the percentage of work, number of pay periods, or number of hours performed inside California. Plaintiffs made no effort to do so at trial. Try as it may, the court is unable on its own to reconstruct that information from the evidence before it.

At trial, the pay stubs for plaintiffs Shook and Berringer were introduced, which show the total miles driven by the drivers and the beginning and end points of the routes driven. Such information is insufficient to allow the court to determine what how much time plaintiffs spent in California during a given pay period. While perhaps such information could be determined through a combination of the drivers' daily logs and pay stubs, mileage charts, and an online map service, the testimony and exhibits introduced at trial leave the court without any feasible method of calculating the proper penalties and damages as to Shook and Berringer, much less all other California drivers, for whom pay stubs and daily logs were not introduced at trial.

An examination of the evidence also does not give the court the tools necessary to determine defendants' potential liability. Defendant introduced charts showing the number of miles driven by all Indian River drivers in each state in a particular quarter. (See Def.'s Ex. D.) Such charts do not allow the court to determine what percentage of time, number of pay periods, or number of hours Indian River's California drivers spent working in California overall, much less in any particular pay period. Indeed, plaintiff's counsel himself criticized the chart due to its failure to show how much time drivers spent in California.

Accordingly, plaintiffs' claims for violations occurring within the state of California fail due to their failure to meet their burden of establishing the extent of any violations by Indian River as well as the proper penalties or damages for such violations. Defendants are thus entitled to judgment on all of plaintiffs' claims with respect to all work performed inside California.

### C. Safe Harbor

█ Even assuming the California Labor Code's provisions applied extraterritorially or that plaintiffs met their burden of proof to establish the extent of any violations and accompanying penalties or damages, the court concludes that California's Safe Harbor provision in Labor Code § 226.2 bars plaintiffs' claims.

California Labor Code § 226.2(b) provides that if an employer pays its current and former piece-rate employees 4% of their gross wages between July 1, 2012 and December 31, 2015 ("the Safe Harbor period"), the employer will have an affirmative defense:

> to any claim or cause of action for recovery of wages, damages, liquidated damages, statutory penalties, or civil penalties, including liquidated damages pursuant to Section 1194.2, statutory penalties pursuant to Section 203, premium pay pursuant to Section 226.7, and actual damages or liquidated damages pursuant to subdivision (e) of Section 226, based solely on the employer's failure to timely pay the employee the compensation due for rest and recovery periods and other nonproductive time for time periods prior to and including December 31, 2015.

See Fowler Packing Co. v. Lanier, 844 F.3d 809, 811–12 (9th Cir. 2016) (discussing section 226.2's Safe Harbor provision).

Here, Indian River properly notified the California Department of Industrial Relations of its election to make Safe Harbor payments to its current and former employees on June 27, 2016. Indian River also paid 4% of its current and former employees' gross wages to its current former employees, including plaintiffs, for the period between July 1, 2012 and December 31, 2015 complied with California Labor Code § 226(b). Thus, defendant has fully complied with California Labor Code § 226(b)'s requirements.

### 1. Carve–out

■ Even where an employer complies with Labor Code § 226.2(b)'s notice and payment requirements, the Safe Harbor defense does not apply to claims exempted under certain "carve-outs" provided in section 226.2(g). See Fowler, 844 F.3d at 812–13. One such carve-out, section 226.2(g)(3), provides that the Safe Harbor defense shall not apply to "[c]laims that employees were not advised of their right to take rest or recovery breaks, that rest and recovery breaks were not made available, or that employees were discouraged or otherwise prevented from taking such breaks." Here, plaintiffs contend that this carve-out bars defendant's Safe Harbor defense because plaintiffs claimed they were not informed of their right to take rest breaks under California law, were not provided rest breaks, and were discouraged from taking rest breaks.

However, plaintiffs' Complaint asserts no claim based on Indian River's failure to advise California drivers of their right to take rest or recovery breaks under California law. Rather, the Complaint refers to Indian River's alleged failure to authorize and permit drivers to take rest breaks and failure to separately pay for such breaks, without any mention of a failure to inform drivers of such rights. (See, e.g., Compl. ¶¶ 4–6, 21, 34–37, 46, 56 (Docket No. 4).) Thus, section 226.2(g)(3)'s carve out for claims that an employer failed to inform its employees of their right to take breaks under California law does not apply and does not bar Indian River's Safe Harbor defense.

The court assumes that section 226.2(g)(3)'s carve-out applies to plaintiffs' claim that Indian River failed to provide rest breaks and prevented or discouraged such breaks. However, the court finds no credible evidence that Indian River failed to provide rest breaks or sought to discourage or prevent drivers from taking such breaks. As discussed above, the court finds credible the testimony of multiple witnesses that drivers were encouraged to take breaks at any time and as frequently as necessary and that drivers did so. The court also finds credible the testimony of multiple witnesses that drivers were not

discouraged or prevented from taking breaks. Indeed, plaintiffs Shook and Berringer did not testify that they were prevented or discouraged from taking breaks. Thus, section 226(g)(3)'s carve-out for claims that claims that rest and recovery breaks were not made available, or that employees were discouraged or otherwise prevented from taking such breaks, does not apply due to lack of sufficient proof and does not bar Indian River's Safe Harbor defense.

### 2. Scope of Safe Harbor

Section 226.2's Safe Harbor provision bars all of plaintiffs' claims based on conduct during the Safe Harbor period, as the affirmative defense applies broadly to any claim for recovery of wages, damages, statutory penalties, civil penalties, and premium pay, including claims based on the failure to pay drivers for nonproductive time under section 226.2(a)(1); failure to provide a proper itemized wage statement under sections 226(a) and 226.2(a)(2); waiting time penalties under section 203; and penalties under PAGA.[3] Thus, defendants are entitled to judgment on all of plaintiffs' claims with respect to all work performed during the Safe Harbor period.

### 3. Post Safe–Harbor Period

Because Indian River changed its compensation policy and wage statements to comply with California law on September 5, 2016, any liability could only be based on conduct from January 1, 2016 to September 4, 2016. Thus there are only 36 pay periods during which there could be violations relating to the non-payment of non-productive time, and to the non-payment of rest-break time, which would include any derivative claims for statutory or civil penalties. However, plaintiffs were not employed by Indian River after the Safe Harbor period and thus cannot personally recover penalties or damages for the post–Safe Harbor period.

Nor can plaintiffs recover on behalf of other employees for the post–Safe Harbor period. Shook's and Berringer's claims were extinguished by their receipt of the Safe Harbor payments and they were not employed after the Safe Harbor period. Thus, they are not "aggrieved employees" under PAGA, at least with respect to the post–Safe Harbor period. See Cal. Labor Code § 2699(a), (i); Wassink v. Affiliated Comput. Servs., Inc., Case No. 8:11–cv–00554–CJC(MLGx), 2011 WL 13077358, at *3 (C.D. Cal. Dec. 21, 2011) (plaintiff must be an "aggrieved employee" to bring a representative PAGA action); accord Thomas v. Home Depot USA, Inc., 527 F.Supp.2d 1003, 1009 (N.D. Cal. 2007) (plaintiff could not assert PAGA claim in representative capacity as the statute of limitations had run with respect to his individual PAGA claim).

The court accordingly finds that Indian River is entitled to judgment on all of plaintiffs' causes of action based on Indian River's Safe Harbor defense.

### III. Conclusion

For all the foregoing reasons, THE COURT HEREBY FINDS in favor of de-

---

**3.** The text of Labor Code § 226.2 specifically references "civil penalties," i.e., penalties that may be collected only by the Labor Commissioner or by an aggrieved employee acting as a private attorney general under PAGA. See Caliber Bodyworks, Inc. v. Superior Court, 134 Cal.App.4th 365, 377–78, 36 Cal.Rptr.3d 31 (2d Dist. 2005). Moreover, section 226.2(f) specifically provides that one who has paid back wages through the Safe Harbor will void "[a]ny notice to the Labor and Workforce Development Agency on or before December 31, 2015, pursuant to paragraph (1) of subdivision (a) of Section 2699.3, alleging violations based upon failure to properly compensate employees for rest and recovery periods."

fendants on all claims by all defendants.[4] Each side shall bear its own attorneys' fees. The Clerk of Court is instructed to enter judgment accordingly.

IT IS SO ORDERED.

---

4. Because the court finds in favor of defendant for the reasons above, the court does not address defendant's other arguments raised in its defense.